<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

_____ :
                                  :
KELVIN RAY LOVE,                  :
                                  :
            Plaintiff,            :   Civil Action No. 10-1714 (GEB)
                                  :
        v.                        :
                                  :
NEW JERSEY DEPARTMENT             :
OF CORRECTION, et al.,            :        **O P I N I O N**
                                  :
            Defendants.           :
_____ :

**Brown**, Chief Judge:

This matter comes before the Court upon a series of recent filings executed by Plaintiff, namely, his amended complaint, <u>see</u> Docket Entry No. 10, his motion to re-amend that amended complaint, <u>see</u> Docket Entry No. 13, and his motion for injunctive relief.  <u>See</u> Docket Entry No. 12.  Plaintiff's motion seeking injunctive relief will be denied, with prejudice.  Plaintiff's motion to amend will be denied in part and granted in part. Plaintiff's claims stated in the amended complaint and his proposed re-amended complaint will be dismissed, with prejudice, short of three narrowly-tailored lines of claims.  Plaintiff's <u>in forma pauperis</u> status will be revoked, and this matter will be administratively terminated subject to reopening in the event Plaintiff either shows cause for reinstatement of his <u>in forma pauperis</u> status or timely prepays the applicable filing fee.

TABLE OF CONTENTS

I.   Background
     A.   Original Complaint
     B.   Plaintiff's Supplement to the Complaint
     C.   The Court's Prior Decision
     D.   Plaintiff's Amended Complaints
          1.   Amended Complaint - First Round
               a.   Prayer in Segregated Confinement
               b.   Passover 2008 Events
               c.   Passover 2009 Events
               d.   Prayers upon Return to the General Population
               e.   Private Possession of Tallit
               f.   Passover 2010 Events
          2.   Remedies Sought in "First Round" Amended Complaint
          3.   "Second Round" of the Amended Complaint and the
               Motion for Preliminary Injunction
II.  Discussion
     A.   Plaintiff's Right to Exercise His Religious Beliefs
          1.   Equal Protection Aspects
          2.   First Amendment Aspects
               a.   Governing Standard
               b.   Plaintiff's Facially Meritless Claims
                    i.   The Nature of Plaintiff's Beliefs
                    ii.  Prayers in Segregated Confinement
                    iii. Reentry into the General Population
                    iv.  Around-the-clock Possession of Tallit
                    v.   Passover 2009 and Second Seder of 2010
               c.   Passover 2008 and First Seder of 2010
     B.   Plaintiff's Allegation Related to Law Library Access
          1.   Construction as an Access-to-the-Courts Claim
               a.   Procedural Deficiency
               b.   Substantive Invalidity
          2.   Construction as an Application to Amend
               a.   Additional Defendants
               b.   Additional Allegations
                    i.   Elaboration of the "Festive Meal" Claims
                    ii.  Claims Based on Lack of Teffilin
     C.   Application for Injunctive Relief
     D.   Future Course of This Litigation
          1.   The Three Strikes Rule
          2.   Plaintiff's Statements Made in This Matter
          3.   Plaintiff's Prior Litigations
               a.   Failure-to-State-a-Claim Actions
               b.   Other Actions
          4.   Plaintiff's Pauper Status Will Be Revoked
III. Conclusion

I.    **BACKGROUND**

    A.    **<u>Original Complaint</u>**

The Clerk received Plaintiff's original submission (executed on April 1, 2010)[1] on April 6, 2010.  <u>See</u> Docket Entry No. 1. That submission, a diary-like compilation, included the original complaint (which consisted of twenty two pages packing, in turn, seventy two paragraphs) and fourteen pages of various exhibits. <u>See</u> <u>id.</u>

In his original complaint ("Complaint"), Plaintiff asserted that: (a) he held certain religious beliefs related or pertaining to the Jewish faith, but without clarifying the exact nature of his religious beliefs;[2] (b) Plaintiff made his religious perceptions known to his prison officials at a certain unspecified point in time; (c) during his confinement, Plaintiff requested Passover meals but was denied the same; and (d) Plaintiff requested to partake in certain congregational chanting of Jewish prayers but was denied the same.  <u>See</u> Docket Entry No. 1.  The exhibits attached to the Complaint indicated that

---

[1] Since certain Plaintiff's claims arise out of the events that, allegedly, took place on April 19, 2010, and on, this Court presumes – for the purposes of this Opinion only and without making a factual finding – that all Plaintiff's claims are timely and, hence, subject to screening on merits.

[2] Jewish movements, often referred to as denominations or branches of traditional Judaism, differ from one another in ways that adherents to these denominations find material, that is, from the religious point of view.

Plaintiff had been asked by the Chaplaincy Department at his

place of confinement to provide contact information of rabbis

sharing Plaintiff's seemingly unique religious views so that the

prison officials could attempt to accommodate his religious

needs.[3]  See id.

---

[3] One of the letters from the head of the Chaplaincy
Department included in Plaintiff's exhibits read as follows:

> The title for religious staff is chaplains.  They are
> require to provide or facilitate religious services,
> education and counseling to [the] inmates.  We have
> chaplains that assist inmates of other faiths to
> practice their religion.  Rabbi Spritzer has informed
> you verbally and in writing that he is willing to help
> you in practicing your faith.  It should be understood
> that Judaism like other religions has different sects
> or denominations.  Freedom of Religion does not permit
> the state, a group or an individual to impose or force
> someone to practice a particular religion.  This
> freedom is afforded to both inmates and chaplains.
> Although the Rabbi may not be able to perform certain
> rites with you, he is willing to help find people from
> your denomination.  I would suggest that you discuss
> your needs when you meet with him.  I would encourage
> you to work with the Rabbi.  He has expressed a
> willingness to assist you.  We have Buddhist, Wicca,
> Hindus and others who do not have a chaplain or
> volunteers.  They seek the help of the Chaplaincy
> Department and are provided assistance.  A conversation
> with the Rabbi might be very beneficial.

Docket Entry No. 1-1, at 10; see also id. at 6 (replicating a
related letter from Rabbi Spritzer reading, inter alia, "It is
the policy of the chaplaincy department to help any and all
individuals in their religious needs.  In regard to your request,
we are prepared to contact a person of faith that would help you
in your religious needs, and ask them to volunteer and minister
you in any way that would help you in your religious needs.
Please furnish us with the name or names of individuals that we
may contact on your behalf").  Plaintiff, seemingly, was unable
to provide the Chaplaincy Department with the names of any rabbis
practicing Judaism in the way exactly corresponding to

The Complaint named, as Defendants in this matter, the DOC, Warden Michelle R. Ricci ("Warden"), Imam Suluki ("Imam," asserting that the Imam was the Head Chaplain at Plaintiff's place of confinement), Rabbi Goldenberg (asserting that the Rabbi used to be the Jewish Chaplain at Plaintiff's place of confinement), Rabbi Spritzer (asserting that the Rabbi was the currently retained Jewish Chaplain at Plaintiff's place of confinement), and "John or Jane Doe" (asserting that these "Does" were leaders of certain unspecified religious groups volunteering, <u>inter alia</u>, at Plaintiff's place of confinement). <u>See</u> <u>id.</u>

Plaintiff maintained that these Defendants were liable for violations of Plaintiff's civil rights because: (a) the Imam did not provide Plaintiff with Passover meals and unspecified "necessary religious elements"; (b) Rabbi Goldenberg allowed Jewish inmates in the general prison population to congregate for the purposes of group prayer, but did not allow the same to the inmates held in segregated confinement;[4] (c) Rabbi Goldenberg

---

Plaintiff's preferences for religious services.

    [4]  The exhibits attached to the Complaint indicated that Plaintiff's place of confinement held two inmates, who identified themselves as religious Jews, in segregated confinement (one of whom, seemingly, was Plaintiff), and at least 16 inmates of the same religious identification in the general population. Therefore, the Court is not entirely clear as to Plaintiff's interest in "congregating" with another Jewish inmate in segregated confinement, since traditional Judaism places religious importance on the concept of "minyan," <u>i.e.,</u> the quorum

failed to properly train and supervise Does, due to which (d) Does excluded Plaintiff from chanting certain Jewish prayers and did not provide Plaintiff with "necessary means of celebrating the first Passover Seder"; (e) Rabbi Spritzer continued Rabbi Goldenberg's practices; and (f) the Warden was the supervisor of Plaintiff's place of confinement.  See Docket Entry No. 1.  The Complaint indicated that Plaintiff sought damages and injunctive relief, asserting that he was "racially discriminated" against by Defendants' position, which Plaintiff defined as a notion that "Plaintiff [was] not of Jewish race."  See id. at 15, 21.

    **B.**   **Plaintiff's Supplement to the Complaint**

On June 21, 2010, the Clerk received Plaintiff's submission titled "amended complaint," see Docket Entry No. 2, but – just two days later – the Clerk also received Plaintiff's "amended motion" clarifying that the "amended complaint" was intended to operate as a "supplement" to the Complaint.  See Docket Entry No. 3.  This "supplement" added another seventeen pages (comprised out of eighty-six paragraphs) to Plaintiff's Complaint, plus three pages of additional exhibits.  See Docket Entry No. 2.  However, in its substance, the "supplement" largely repeated the Complaint, although it increases the list of Defendants, and the

---

of ten male Jewish adults who gather for certain religious
obligations, the most common of which is public prayer.  However,
the Court cannot rule out the possibility that the unique
religious perceptions held by Plaintiff allocated a certain
importance to congregational prayer by two adult males.

newly added exhibits suggested that a certain piece of
Plaintiff's property had been "taken" by prison officials,
although the nature of that property or of that "taking" were not
detailed in the supplement.[5]  <u>See</u> <u>id.</u>

**C.   <u>The Court's Prior Decision</u>**

On August 10, 2010, this Court issued a memorandum opinion
and order ("August Order") dismissing Plaintiff's Complaint.  <u>See</u>
Docket Entry No. 7.  Specifically, the Court dismissed
Plaintiff's claims against the DOC with prejudice, since the DOC
was not a "person" within the meaning of Section 1983 action.
<u>See</u> <u>id.</u> at 6 (citing <u>Will v. Michigan Dept. of State Police</u>, 491
U.S. 58, 64, 70-71 and n.10 (1989); <u>Grabow v. Southern State</u>
<u>Correctional Facility</u>, 726 F. Supp. 537, 538-39 (D.N.J. 1989)).

All other claims, stated in one hundred and fifty-eight
paragraphs of the Complaint and its "supplement," were dismissed
without prejudice for failure to meet Rule 8 requirements.  <u>See</u>
<u>id.</u> at 6-7.  In order to provide Plaintiff with additional
guidance, the Court clarified to Plaintiff why his overly-
voluminous submissions (omitting, nonetheless, statements of
vital facts) failed to satisfy both the requirements of Rule
8(a)(2) and the pleading standard set forth in <u>Ashcroft v. Iqbal</u>,

---

[5]  Plaintiff's submissions clarified the nature of a certain
property Plaintiff *wished to purchase* but not the nature of the
property *taken* (which could or could not have been the property
Plaintiff sought to purchase).  <u>See</u> Docket Entry No. 2.

129 S. Ct. 1937 (2009).  <u>See id.</u>  In addition, the Court noted

its concern with whether Plaintiff's claims against Does and/or

the Imam, Rabbi Goldenberg, Rabbi Spritzer met the color of law

requirement.  <u>See id.</u> at 7-13.  The August Order directed

Plaintiff to file an amended complaint stating, clearly and

concisely, only the facts of Plaintiff's claims.  <u>See id.</u> at 16-

18.

D.   **Plaintiff's Amended Complaints**

1.   **Amended Complaint - First Round**

In response, Plaintiff submitted his amended complaint

("Amended Complaint") that differed substantially from the

Complaint, both in terms of the substance of Plaintiff's claims

and the identities of the culpable parties.[6]  <u>See</u> Docket Entry

No. 10.  While being shorter than the Complaint and its

"supplement," the Amended Complaint, nonetheless, presented a

lengthy document (comprised of pages of a pre-printed form and

hand-written pages which packed, on occasion, up to thirty-six

---

[6] Among the most notable distinctions were: (a) elimination
of Plaintiff's claims asserting that he was "racially
discriminated" for being, seemingly, a self-defined righteous
gentile rather than a born (or formally converted) Jew; and (b)
elimination of all references to unspecified religious
volunteering organizations. Indeed, the Amended Complaint appears
to have transformed Defendant "Doe" in the Complaint from the
head of an unspecified volunteering organization into "Doe 2," a
correctional officer who allegedly mis-forwarded Plaintiff's
application to a prison department not having control over the
issue raised in that application.  <u>Compare</u> Docket Entry No. 1 to
Docket Entry No. 10.

lines of a super-small script per page), providing a rather patchy account of Plaintiff's facts.  See id.  To the degree the Court can systemize these facts, Plaintiff's allegations appear to be as follows:

a.  Prayer in Segregated Confinement

Prior to March 2008, Plaintiff was held in the general prison population and so, during that period, partook in certain group payers of a congregation consisting of the Jewish inmates held in that general population (and who were, at that time, ministered-to by Rabbi Goldenberg and/or by Rabbi Goldenberg's predecessor/colleague, who seemed to be Rabbi Lev).  See id. at 9.  However, according to the Complaint, Plaintiff was placed in segregated confinement in March 2008, where he would remain for more than two years until his reentry into the general prison population on March 15, 2010.  During this time, Plaintiff alleges he: (a) experienced a three-month lull in ministered weekly prayers; that lull occurred about half-way into the period of his segregated confinement (specifically, from June 17, 2009, to September 24, 2009);[7] and (b) did not have a rabbi present

_____

[7]  Plaintiff's submissions indicate that, since Rabbi Goldenberg left his position as Jewish chaplain on June 17, 2009, see Docket Entry No. 1, at 16, Rabbi Spritzer was retained, as Rabbi Goldenberg's replacement, sometime after June 17, 2009, and began ministered weekly prayers with Plaintiff on the week of September 24, 2009.  See id. at 17.  In other words, it appears that Rabbi Spritzer began ministered weekly prayers with Plaintiff either right upon being retained or took either a few weeks or up to three months to establish his routine: depending

during his morning prayers until Plaintiff's reentry into the
general prison population.[8]  The Complaint, therefore, asserts
that Plaintiff's rights were violated during his segregated
confinement by the lack of ministered morning prayer and/or by
his inability to attend a congregational morning prayer rendered
by the Jewish inmates confined in the general prison population.
In addition, the Complaint asserts that Plaintiff's civil rights
were violated during this segregated confinement period because
the sessions of ministered weekly services provided to him, which
were shorter than the weekly services provided to the general
prison population, were too short to satisfy the weekly prayer
requirements of Plaintiff's self-proclaimed faith.  See id. at 9-
10.

      b.   Passover 2008 Events

At an unspecified point in time prior to April 19, 2008,
Plaintiff (being already held in segregated confinement)
requested to be put on the list of inmates wishing to obtain

---

on the exact date of Rabbi Spritzer's retention.

    [8] It appears that the string of Plaintiff's written
administrative submissions insisting that, pursuant to
Plaintiff's religious perceptions, a rabbi had to be present,
daily, during Plaintiff's morning prayers (as well as Plaintiff's
other disagreements with Rabbi Spritzer's mode of ministering)
resulted in the Imam and Rabbi Spritzer's requests to provide the
Chaplaincy Department with the contact information of those
rabbis who shared Plaintiff's unique religious perceptions (in
order to retain services of those rabbis and have them minister
to Plaintiff), but Plaintiff, seemingly, failed to identify any
such chaplain.  See Docket Entry No. 1-1, at 6, 10.

Passover "treats"[9] that had been, allegedly, served to Jewish inmates at Plaintiff's place of confinement at the first Seder and at the second Seder of each Passover.[10]   See id. at 8. However, Plaintiff alleges that no Passover "treat" of any kind was served to him for the first Seder of 2008 and – for the second Seder of 2008 – the Imam provided him only with grape juice.   See id.   In other words, the Complaint may be construed as asserting that Plaintiff was served with no Passover meals of any kind for the first and second Seders of 2008 and, perhaps, no dinner meals whatsoever, short of the grape juice brought by the Imam for the second Seder of 2008.

      c.   Passover 2009 Events

Prior to April 2009, Plaintiff (still being held in segregated confinement) again, allegedly, requested to be put on the list of Jewish inmates wishing to obtain Passover "treats." See id.   According to the Complaint, in response to his request, Plaintiff was served with a "treat" that included: (a) a

---

[9] Since the issue of the content of a "proper" Passover "treat" is part of Plaintiff's claims, the Court uses the word "treat" to distinguish between the specialty meals served for Passover and the routine kosher meals served to Jewish inmates.

[10] A Seder (meaning, in Hebrew, an "order" or "arrangement") is a Jewish religious ritual marking the Jewish holiday of Passover.   The Seder ritual includes, inter alia, the consumption of a specific meal.   Under the traditional Hebrew calendar, the first Seder is held on the evening of the 14th day of Nisan, which typically corresponds to either late March or early- to mid-April in the Gregorian calendar.   See <<http://www.being Jewish.com/yomtov/passover/schedule1.html>>.

traditional Seder plate; (b) a traditional roasted shank bone; (c) a traditional hard boiled egg; (d) traditional bitter herbs; (d) a serving of traditional "charoset" (a sweet chunky paste made of fruits and nuts); (e) a serving of traditional "karpas" (a vegetable, which usually means parsley or celery); (f) "chazeres" (traditional bitter herbs);[11] (g) three sheets of matzoh; (e) a container of grape juice (seemingly substituting for Passover wine); (f) traditional salted water needed for the Seder ritual; and (g) a ritual cup.  This "treat" was served to him for the first Seder of 2009 and repeated, identically, for the second Seder of 2009.  See id.  While conceding that the above-listed ingredients did, indeed, comprise the entire list of traditional items served to celebrate the ritual part of Passover Seder order, see id., Plaintiff asserts that the "treats" he was served were insufficient because they did not include a "pillow"[12] and an unspecified "festive meal," that is, in addition to the above-listed items included in the "treat."  See

---

[11] While Plaintiff's Complaint made separate references to "bitter herbs" and to "chazeres," it appears that these items were the same thing.

[12] Beaded or embroidered pillows are a decoration sometimes utilized to elaborate Passover celebrations, in the sense that the guests, invited to attend the Seder, are also invited by the host/hostess to recline on these elaborately decorated cushions while drinking the wine and eating the matzoh, seemingly because such pillow signifies the comforts of the Passover freedom: by allowing the guests to elect whether to sit straight or lean on the pillow.  See <<http://www.happypassover.net/4-questions.html>>.

id.  Plaintiff asserts that, in response to his inquiry with the
Imam as to the lack of a "pillow" and a "festive meal,"[13] the
Imam responded that he served Plaintiff with "all there was."
See id.

        d.  <u>Prayers Upon Return to the General Population</u>

      According to the Complaint, Plaintiff reentered the prison's
general population on March 15, 2010, but that reentry was not
accompanied by Plaintiff's automatic inclusion in the list of the
general population inmates cleared for entrance to the "balcony"
part of Plaintiff's correctional facility, where, apparently, the
Sabbath prayers and morning prayers of the Jewish inmate
congregation were typically held.  See id. at 8 (indicating that
Plaintiff's name was removed from the list, seemingly due to, and
during, Plaintiff's placement in segregated confinement for two
years).  Rather, Plaintiff had to submit a written request for
such clearance, and he allegedly did so three days after his
reentry into the general prison population, that is, on March 18,
2010.  See id.  However, since – according to the Complaint –

---

    [13]  Plaintiff's submissions, at no point, defined the exact
meaning of the phrase "festive meal," that is, as Plaintiff
construes this term from the point of view of his particular
religious beliefs, or even from the point of view of the
traditional Judaism.  Rather, Plaintiff's submissions indicate
that he corresponds this phrase to his desire for "a" fancy
dinner, which would include elaborate but unspecified main
courses (that Plaintiff prefers to be based on meat, obviously
kosher) and equally elaborate – although unspecified – deserts.
See e.g., Docket Entry No. 10, at 11.

Plaintiff's request for clearance was erroneously forwarded to the Custody Coordination Department rather than to the Chaplaincy Department, this mis-forwarding caused a delay in Plaintiff's clearance, necessitating his additional oral inquiries and re-submission of application forms.  So Plaintiff was finally placed on the list of inmates allowed to the balcony for the purposes of Jewish congregational prayer on May 6, 2010.  See id. at 9.

Plaintiff asserts that this seven-week delay in obtaining clearance violated his constitutional rights.  See id.

e.   Private Possession of Tallit

At the time of his reentry into the general prison population, Plaintiff requested a permission to purchase a tallit.[14]  See id. at 10.  Having his request granted, Plaintiff duly purchased a tallit (which, seemingly, was a tallit gadol)

---

[14] Tallit is a traditional Jewish prayer shawl.  There are two kinds of tallit: (a) "tallit gadol," which is a very large shawl worn during prayers (the shawl is so large because it must cover most of the wearer's body, over the clothing; therefore the average size of a tallit gadol is at least five feet by two feet, although six feet by three feet are very common); and (b) "tallit katan," which is a somewhat smaller but, nonetheless, also a sizable shawl, usually worn at all times under the clothing, as a religious undergarment (but such wearing is, typically, performed in no relation to one's prayer); both garments are decorated by fringes referred-to as "tzitzit."  See <<http://www.bje.org.au/learning/judaism/symbols/tallit.html>>.  However, the Court stresses that it does not rule out the possibility that, pursuant to Plaintiff's unique religious beliefs: (a) one might be required to wear a tallit katan in connection with one's prayers, be it , over the clothing or under; or (b) one might be required to wear a tallit gadol as a religious undergarment; or (c) there is no distinction between a tallit katan and a tallit gadol.

and has been utilizing it for his morning prayers ever since, every day of the week, see id., but he had his request to keep his tallit in his personal possession (i.e., in his cell, around the clock) denied; rather, his tallit has been kept in the prison's safekeeping and released to Plaintiff each morning, for the purposes of his morning prayers.  See id.

Plaintiff asserts that his civil rights were and are violated by having restricted access to his tallit, since, according to the Complaint, Plaintiff also prays frequently at random times during the afternoon and evening.  Without unrestricted access to his tallit, Plaintiff claims that his random daily prayer sessions have been hindered.

f.   Passover 2010 Events

In addition to the foregoing, Plaintiff also asserts that there was another set of events which took place upon Plaintiff's reentry into the general population.  As noted supra, Plaintiff alleged that, on March 18, 2010, he submitted his request to be cleared for entry to the balcony (for the purposes of Jewish congregational prayers).  It appears that this request was submitted in conjunction with Plaintiff's request to be cleared for attendance of the congregational celebration of the first and second Passover Seders in 2010 (which, in 2010, took place on

March 29 and March 30).[15]   The Amended Complaint asserts that,
when Plaintiff learned that his request for clearance (seeking to
be allowed at the locale of the Jewish daily morning prayer) was
erroneously forwarded to a wrong administrative department (i.e.
to the Custody Coordination Department rather than to the
Chaplaincy Department), he realized, by March 29, 2010, or
shortly prior, that he might be unable to attend the
congregational Passover celebration held by the general
population inmates.  See id. at 8.  Therefore, when Plaintiff met
the Warden (who was making her in-person rounds around the
facility) at an unspecified hour on March 29, Plaintiff related
to her his concerns.  In response, the Warden immediately granted
limited emergent clearance for Plaintiff to attend the
congregational Passover Seders.  See id. (asserting that, right
upon communicating with Plaintiff, the Warden orally directed her
assistant, Christopher Holmes ("Mr. Holmes"), to ensure
Plaintiff's ability to attend the Seders).  Plaintiff alleges
that he was, indeed, allowed to leave the area of his confinement
and proceeded toward the area of first Seder celebration at 6:05
p.m. on March 29, but he maintains that no Passover meal (and,
seemingly, no meal of any kind) was served to him, and that all

---

[15] The Court presumes – for the purposes of this Opinion only
and without making a factual finding – that Plaintiff also
requested to be placed – and was, in fact, placed – on the list
of inmates wishing to receive Passover "treats" in 2010.

other Jewish inmates held in the general population arrived to the celebration earlier, i.e., at 4:30 p.m. and – hence – already completed the entire Passover ritual prior to Plaintiff's arrival.  See id. at 8.  Plaintiff also alleges that, upon his arrival, he saw no "signs" or even "remains" of any "festive meal" served to these inmates.  See id. at 8-9.

   With regard to the second Seder of 2010, the Amended Complaint alleges that Plaintiff was allowed to arrive at 4:30 p.m. and fully participated in the entire Seder ritual but was left unsatisfied with the "festive meal" – seemingly provided in addition to or as part of the Passover "treat" served to him – since the meal offered consisted of a "regular 12 oz . . . kosher for Passover prepackaged meal," plus matzoh (which one of the chaplains, Sister Elizabeth, was distributing to the attendees, Plaintiff included).  See id. at 9.  Asserting that he "does not consider a regular kosher for Passover vegetarian 12 oz prepackaged tray . . . as a Feast," Plaintiff maintains that his civil rights were violated by this offering, since it failed to meet his definition of "festiveness."  See id.

   **2.   Remedies Sought in "First Round" Amended Complaint**

   Plaintiff's Amended Complaint closed with an application for monetary damages and injunctive relief in the form of an order directing Defendants to: (a) allow Plaintiff around-the-clock possession of his tallit in his cell; and (b) allow "Plaintiff to

purchase kosher for Passover meats, vegetables, fruits and deserts from . . . a vendor" selected by Plaintiff, _i.e._, a meal elaborate enough to satisfy Plaintiff's opinion as the degree of "festiveness" due to him under the Constitution.  See _id._ at 11.

### 3.  "Second Round" of the Amended Complaint and the Motion for Preliminary Injunction

Following his submission of the Amended Complaint, Plaintiff filed a motion for preliminary injunction which, effectively, was a legal brief void of any factual statements short of Plaintiff's assertion that his reading of "Tanakh"[16] was such that Plaintiff believed he was obligated to possess and constantly wear "a four cornered garment with fringes on the corners," which the Court reads as a reference to a tallit.  Docket Entry No. 12-1, at 5. In light of the foregoing, the motion asserted that Plaintiff was suffering an irreparable injury each time he was rendering a prayer while not wearing his tallit.  See _id._

Plaintiff's other motion, seeking leave to re-amend his Amended Complaint, similarly asserted no facts (short of

---

[16] The Court presumes that Plaintiff wished to refer to the Tanakh, _i.e.,_ the compilation the content of which is easiest understood by comparison to that of the Torah.  The word "Torah" can mean different things in different contexts: the term can refer, in its most limited sense, to the Five Books of Moses (Genesis, Exodus, Leviticus, Numbers and Deuteronomy) but it can also refer to the entire body of Jewish scriptures, _i.e.,_ to the prescripts predominantly corresponding to the part of the Bible known as the "Old Testament" (this set of prescripts is known as the "Tanakh") together with the entire body of the Jewish Laws and Teachings. See <<http://www.jewfaq.org/torah.htm>>.

Plaintiff's belief that he was provided with insufficient access to the law library and, hence, had insufficient opportunity to elaborate on the statements he already made in: (a) the legal brief submitted as his motion for preliminary injunction: (b) in the hundred fifty eight paragraphs comprising his Complaint and "supplement" to it; and (c) in the thirteen pages of his Amended Complaint packing, on occasion, thirty six lines of super-small script per page).  This motion arrived accompanied, oddly enough, by an exhibit showing that, as of April 31, 2010 (that is, during the period when Plaintiff drafted and filed his "supplement" to the Complaint, his Amended Complaint, his application for preliminary injunction and even his motion to re-amend on the grounds of having insufficient access to the law library), Plaintiff was, actually, allowed *extended* access to the law library.  <u>See</u> Docket Entry No. 13-1.

## II.  DISCUSSION

### A.  <u>Plaintiff's Right to Exercise His Religious Beliefs</u>

#### 1.  Equal Protection Aspects

"Broadly construed, Plaintiff's Amended Complaint and prior submissions contained numerous allegations that appear to assert claims under equal protection.  To review, Plaintiff alleges that:

(a)  congregational prayers (while Plaintiff, allegedly, was not

     allowed to "congregate" – either with the general population

inmates or the one other segregated Jewish inmate – during the time when Plaintiff was held in segregated confinement);

(b)   Rabbi Spritzer's longer sessions of weekly (presumably Sabbath) ministering to this large group (and/or a longer Rabbi-led Sabbath prayers with this large group), that is, longer in comparison with the allegedly shorter period of Rabbi Spritzer's weekly, presumably Sabbath, personalized ministering to Plaintiff (and/or in comparison with the Rabbi-led, allegedly shorter, weekly prayer with Plaintiff, personally) while Plaintiff remained in segregated confinement; and

(c)   Rabbi Spritzer's daily (presumably non-Sabbath, i.e., six-day-a-week, except on Holy Days) morning prayers with this large group, while Plaintiff, allegedly, was not having a rabbi accompanying him in his individual (presumably non-Sabbath and non-Holy Days) daily morning prayers during the time when Plaintiff was held in segregated confinement.

The Court, therefore, finds it warranted to start its discussion by briefly visiting this Fourteenth Amendment issue.

The Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. "This is not a command that all persons be treated alike but, rather, 'a direction that all persons similarly situated should be treated

alike.'" <u>Artway v. Att'y Gen. State of N.J.</u>, 81 F.3d 1235, 1267 (3d Cir. 1996) (quoting <u>City of Cleburne, Tex. v. Cleburne Living Center</u>, 473 U.S. 432, 439 (1985)).

The level of scrutiny applied to ensure that classifications comply with this guarantee differs depending on the nature of the classification and the nature of the rights involved. Hence, classifications involving a suspect or quasi-suspect class, or actions that impact certain fundamental constitutional rights, are subject to heightened or "strict" scrutiny. <u>See</u> <u>City of Cleburne</u>, 473 U.S. at 439. All other classifications are subject to the "rational basis" test, which requires that a classification need only be rationally related to a legitimate state interest to survive an equal protection challenge. <u>See</u> <u>F.C.C. v. Beach Communications, Inc.</u>, 508 U.S. 307 (1993) (state action that does not affect a suspect category or infringe on a fundamental constitutional right must be upheld against equal protection challenge if there is *any reasonably conceivable* facts that could provide a rational basis for the classification); <u>see also</u> <u>Chapman v. United States</u>, 500 U.S. 453, 465 (1991).

Here, Plaintiff asserts that he was "discriminated" against, in comparison to Jewish inmates held in the general prison population, on the grounds of being held in segregated confinement. However, it is well settled that prison inmates – even those held in general prison populations – are not a suspect

class.  See e.g., Nicholas v. Tucker, 114 F.3d 17, 20 (2d Cir.
1997) (inmates are not suspect class so as to require more
exacting scrutiny), cert. denied, 523 U.S. 1126 (1998); see also
Webber v. Crabtree, 158 F.3d 460, 461 (9th Cir. 1998) (same);
Hampton v. Hobbs, 106 F.3d 1281, 1286 (6th Cir. 1997) (same);
Zehner v. Trigg, 133 F.3d 459, 463 (7th Cir. 1997) (same).  A
fortiori inmates held in segregated confinement cannot qualify as
a suspect class.  See, e.g., Hernandez v. Schriro, 2008 U.S.
Dist. LEXIS 34068 (D. Ariz. Apr. 14, 2008) (segregated inmates
are not a suspect class); Moore v. Burt, 2007 U.S. Dist. LEXIS
65293 (E.D. Mich. Sept. 5, 2007) (same); Clemmons v. Nelson, 1999
U.S. Dist. LEXIS 5360 (D. Kan. Apr. 5, 1999) (same).  Therefore,
Plaintiff's equal protection claims are subject to dismissal if
the Court can hypothesize a rational basis for the distinction in
Plaintiff's treatment during his segregated confinement and in
the treatment of inmates held in general population.  See Beach
Communications, 508 U.S. at 313; see also Lada v. Del. County
Cmty. College, 2009 U.S. Dist. LEXIS 91634, at *18 (E.D. Pa.
Sept. 30, 2009) ("'Because this court can hypothesize a rational
basis' for the challenged government action, plaintiff's equal
protection claim must be dismissed") (quoting Mercatus Group LLC
v. Lake Forest Hospital, 528 F. Supp. 2d 797, 817 (N.D.Ill.
2007), and citing  Sauers v. Bensalem Twp., 2003 U.S. Dist. LEXIS
4706, at *11-12 (E.D. Pa. Mar. 5, 2003)); Little v. Terhune, 200

F. Supp. 2d 445, 452 (D.N.J. 2002) ("A court may uphold state action creating a classification on any conceivably valid purpose, even when the court itself supplies the hypothetical basis") (citing Tillman v. Lebanon County Corr. Facility, 221 F.3d 410, 423 (3d Cir. 2000), Malmed v. Thornburgh, 621 F.2d 565, 570 (3d Cir. 1980), and Officers Ass'n v. City of Newark, 98 N.J. 212, 227 (1985)).

Little imagination, if any, is required to hypothesize a rational basis for the distinction in treatment alleged by Plaintiff. The security needs of the Plaintiff's place of confinement warrant a prohibition on congregation/commingling of the inmates held in the general population with those held in segregation, just as these security needs warrant a bar on assembly of those inmates who are purposely segregated.

The same logic applies to Plaintiff's claims asserting that the period of Sabbath ministering (or Sabbath Rabbi-led group prayer) catered to the entire body of Jewish inmates held in the general population was longer than the corresponding period of ministering/rabbi-led prayer catered individually to Plaintiff:[17]

---

[17] According to the Amended Complaint and exhibits attached to the Complaint, Plaintiff's individually-catered ministering/rabbi-led prayer lasted about ten minutes, while the same ministering/rabbi-led prayer provided to the sixteen Jewish inmates held in the general prison population lasted about ninety minutes. Arguably, then, Plaintiff received more personal attention (approximately 10 minutes) than the general prison population did (at most 5 minutes, if the 90-minute session is evenly divided among the general population).

it was rational for the prison officials to ration the time Rabbi
Spritzer spent with individual segregated inmates, as well as to
ration the time the correctional officers spent ensuring the
Rabbi's security.  Otherwise, the Rabbi's Sabbath prayer,
allegedly lasting ninety minutes with the entire Jewish inmate
congregation held in the general prison population, would
transform into a four-and-a-half-hour series of rituals, even if
the Rabbi ministered only to Plaintiff and the other Jewish
inmate in segregated confinement by ninety minutes ministering
session each.  Since such a half-day proceeding would unduly
burden the Rabbi's time and the prison's security resources, it
was rational to limit the length of the Rabbi's sessions for the
inmates in segregated confinement.[18]  In the same vein, it was
rational for the prison officials to accommodate the security
needs associated with a daily morning ceremony catered,
simultaneously, to the entire body of Jewish inmates held in the
general population while refusing to make markedly more
burdensome security arrangements associated with having the same

---

[18]   Since the Jewish Sabbath begins at sunset on Friday, the
term "Sabbath prayer" might mean either the evening Friday prayer
or the morning Saturday prayer, or both.  See <<http://www.
religionfacts.com/judaism/holidays/shabbat.htm>>.  Hence, if
Rabbi Spritzer were to start a four-an-a-half-hour chain of
Sabbath services on Friday evening, at sunset, on such a date as
July 21 (when sun sets at 8:23 p.m., see <<http://www.timeand
date.com/worldclock/astronomy.html?n=251&month=7&year=2010&obj=su
n&afl=-11&day=1>>), then he would finish his chain of Sabbath
prayers, and the accompanying security detail would complete its
duties, at approximately 1 a.m.

ceremony catered and re-catered, daily, to each individual Jewish inmate held in segregated confinement.

Consequently, Plaintiff's claims based on comparison of the length of his and general population Sabbath prayers (and on comparison of Rabbi Spritzer's alleged attendance of the general population inmates' daily morning prayers but non-attendance of Plaintiff's individual morning prayers) are subject to dismissal for failure to state a claim upon which relief may be granted. See La Reau v. MacDougall, 473 F.2d 97 (2d Cir. 1972) (dismissing, on the grounds of security concerns, claims of a segregated prisoner asserting that he was precluded from attending the prison's chapel, which the inmates held in the general prison population were permitted to attend), cert. denied, 414 U.S. 878 (1973). Since the facts asserted by Plaintiff's unambiguously establish that his equal protection claims are facially without merit, and – in addition – indicate that the deficiency of this line of challenges cannot be cured by Plaintiff's another re-amendment of his pleadings, these claims will be dismissed with prejudice.

### 2. First Amendment Aspects

#### a. Governing Standard

Turner v. Safley, 482 U.S. 78 (1987), and Overton v. Bazzetta, 539 U.S. 126 (2003), contain the basic substantive legal standards governing this case. [The Supreme] Court recognized in Turner that imprisonment does not automatically deprive a prisoner of certain important constitutional protections, including those

of the First Amendment. [See Turner,] 482 U.S. at 93;
see also O'Lone v. Estate of Shabazz, 482 U.S. 342, 348
(1987).  But[,] at the same time[,] the Constitution
sometimes permits greater restriction of such rights in
a prison than it would allow elsewhere.  See, e.g.,
Turner, [482 U.S.] at 84-85.  As Overton . . . pointed
out, courts owe "substantial deference to the
professional judgment of prison administrators."  539
U.S. at 132.  And Turner reconciled these principles by
holding that restrictive prison regulations are
permissible if they are "'reasonably related' to
legitimate penological interests," [Turner,] 482 U.S.
at 87 . . . .

Beard v. Banks, 548 U.S. 521, 528 (2006).

Turner also sets forth four factors "relevant in determining
the reasonableness of the regulation at issue," Turner, 482 U.S.
at 89, observing that courts should assess: (a) whether there is
a rational connection between the challenged prison regulation
and the legitimate governmental interest; (b) whether there are
alternative means of exercising the religious rights that remain
open to the plaintiff; (c) what impact will accommodation of the
asserted constitutional right have on the prison officials,
general prison resources and other inmates; and (d) whether there
are any ready available alternatives for furthering the
governmental interest.  See id. at 89-90.

        b.   Plaintiff's Facially Meritless Claims

              i.   *The Nature of Plaintiff's Beliefs*

The aforesaid Turner analysis is, however, conducted as a
second step only: such analysis is warranted if the allegations
made by plaintiff show that his/her beliefs are: (a) sincerely

held; and (b) of religious nature.  See DeHart, 227 F.3d at 52.

Here, the allegations and demands for relief stated in Plaintiff's original pleading, its supplement, exhibits, re-pleading and two motions seem to differ, on occasion quite markedly, from the traditional tenets of the Jewish Laws.[19]

Fifteen years after his confinement,[20] Plaintiff initiated his first set of civil rights actions, one of which was Love v. Reed, Civil Action No. 97-0208 (HLJ) (E.D. Ark.).  In that action, Plaintiff was appointed counsel virtually at the outset

---

[19] For instance Plaintiff's current claims associated with his displeasures with the kosher fare served to him at his current prison consummated in his conclusion that he should be allowed to purchase, inter alia, his own selection of "kosher" fruits and vegetables.  The rationale of this position is not entirely clear to the Court, since unpeeled, uncut, washed (i.e., bugs- and worms-free) fruits and vegetables (as they are typically served in prisons to the inmates observing kashrut) are deemed kosher per se.  See, e.g., <<http://www.jewfaq.org/kashrut.htm#Fruits>>; accord Madison v. Horn, 1998 U.S. Dist. LEXIS 12975 at *34 (E.D. Pa. Aug. 21, 1998) (making the same observation while reciting the kosher menu items discussed in Johnson v. Horn, 150 F.3d 276 (3d Cir. 1998)).

[20] Plaintiff "was convicted of the April 5, 1982[, for] capital murder of his teacher and a fellow student at the Garland County Community College.  The jury rejected his plea of not guilty by reason of insanity, imposing a sentence of life without parole."  Love v. State, 281 Ark. 379, 381 (Ark. 1984).  On appeal, Plaintiff raised numerous challenges to his conviction and, eventually, was re-tried, upon a finding by the Supreme Court of Arkansas that prejudicial voir dire statements and jury instructions required a new trial.  See id.  Plaintiff was re-convicted and re-sentenced to serve two life terms.  See <<http://www.adc.arkansas.gov/inmate_info/search.php?dcnum=079351&lastname=love&firstname=kelvin&sex=b&agetype=1>>; see also Love v. Evans, Civil Action No. 00-0091 (JMM) (E.D. Ark.), Docket Entry No. 118, at 2.

of his proceedings and eventually prevailed, after a bench trial,
causing the prison officials' appeal.  On appeal, the Eighth
Circuit: (a) detailed the exact remedy sought by (and granted to)
Plaintiff by the Eastern District of Arkansas; and (c) provided
an insight into Plaintiff's religious beliefs, stating as
follows:

> [When Plaintiff] was incarcerated in 1982, [he]
> identified his religion as "Catholic."  During the
> course of his incarceration, however, [his] religious
> beliefs have changed. [By 2000, when the Eighth Circuit
> issued its decision, Plaintiff became] a self-
> proclaimed adherent of [what he defines as] "Hebrew
> religion" although [he did] not necessarily consider
> himself . . . Jewish — indeed, he [did] not formally
> ascribe to any organized religion — [rather,] he
> [qualified himself as] a student of the Old Testament
> of the Christian Bible, and [alleged that] his
> religious beliefs derive[d] from his own interpretation
> of [the Old Testament]. . . .  From his study of the
> Old Testament, [he] concluded, among other things, that
> it [was] wrong to leave his residence or to work on
> [his] Sabbath, a period which he [decided should] run
> from sundown on Saturday to sundown on Sunday [in
> contrast with the traditional Jewish Sabbath, running
> from sunset on Friday to sunset on Saturday.  His]
> belief about resting on [his Sunday] Sabbath extend[ed]
> to a belief that he should not benefit from work others
> perform on [his Sunday] Sabbath.  [Thus, he] believe[d]
> that he "[was] neither permitted to eat food prepared
> by others on [his Sunday] Sabbath, nor to have others
> serve him through their work on [his Sunday] Sabbath."
> To accommodate these beliefs, [Plaintiff] requested in
> late 1995 that the [prison] provide him with peanut
> butter and bread in his cell on Saturday so that he
> [would] prepare sandwiches to consume in his cell on
> [his Sunday] Sabbath.  . . . [He stated that his]
> belief system [was] derived from his own study of [the
> Old Testament and] his understanding of the tenets of
> his [unique] belief-system [were constantly] evolving .
> . . [T]he district court . . . found that "while [he
> did] not consider himself 'Jewish,' he [did] adhere to
> practices and teachings which are part of the Jewish

faith" [even though h]is beliefs may not fit squarely
with [the traditional] Judaism, in any of its forms.

Id., Docket Entry No. 55, at 1-8 (finding no abuse of discretion
in the district court's determination and observing that the
service-of-peanut-butter-and-bread-on-Saturdays accommodation
requested by Plaintiff posed neither a security concern nor a
burden to the prison official, but merely a sanitation threat
than was analogous to other practices already common to the
operation of the prison where Plaintiff was held at that time);
see also id. at 4, n.7 (noting Plaintiff's testimony that he was
eager to purchase "pre-packaged food in the commissary for
consumption on [his Sunday] Sabbath [but, being] indigent, [he
did] not always have money to purchase such luxuries," which
Plaintiff – to stress the non-attainability of these luxuries –
described stating, "it's just like rain is in the clouds").

    Plaintiff's religious views continued to evolve, and by the
time the Eighth Circuit affirmed the Eastern District of
Arkansas' order to grant Plaintiff the requested peanut-butter-
and-bread-on-Saturday accommodation, Plaintiff had already filed
another civil suit making new dietary requests, see Love v.
Evans, Civil Action No. 00-0091 (JMM) (E.D. Ark.), initially
seeking to be served with meals produced at a fully kosher
kitchen but, during the course of that litigation, he "scaled
back his initial requests" by agreeing to have the Arkansas
Department of Corrections: (a) "credit [weekly, his prison

account with the amount] equal to the amount spent weekly [on an inmate, so he could] purchasing Kosher food items from the commissary"; and (b) "provide him with raw, unpeeled vegetables and fruits, unpeeled boiled eggs, crackers, bread and other prepackaged food certified as Kosher."  Id., Docket Entry No. 118, at 2-3.  The Eastern District of Arkansas granted Plaintiff the aforesaid requested relief,[21] issuing an order which directed the prison officials: (a) to deposit $15 per week on Plaintiff's prison account to allow him his choice of Kosher commissary food; and (b) to serve Plaintiff with "daily vitamin supplements," "a jar of peanut butter and a loaf of bread . . . containing the Kosher designation, to be kept by Plaintiff in his cell and replenished on a regular basis," "[two] boiled eggs every other day, boiled in a small pot designated for Plaintiff's food preparation only," "[daily serving of] fresh fruits and vegetables [that are] washed, . . . unpeeled and uncooked," and "[three] individual cartons of milk daily;" plus (c) to provide the United States District Court for the Eastern District of Arkansas with "a complete list of food items presently stocked [at the] commissary [and marked] Kosher, [all] food items available from the [prison's] vendors [that are marked] Kosher

---

[21]   In Love v. Evans, Civil Action No. 00-0091 (JMM) (E.D. Ark.), Plaintiff was represented by court-appointed counsel; in addition, the Eastern District of Arkansas appointed two attorneys to represent Plaintiff on appeal.  See id. Docket Entry No. 182.

[and with the] identity of each and every entity whom the
[prison] has contacted in an effort to obtain pre-packaged Kosher
food, such as TV dinners, pre-packaged meats, crackers or
cheeses, other foods [marked] Kosher" – for the Eastern District
of Arkansas' selection of the full menu to be served to
Plaintiff.  Id., Docket Entry No. 126; see also Docket Entry No.
149 (informing the prison officials that the court will appoint a
court adviser who would recommend the selection of items and the
composition of menu for Plaintiff, so to yield a Kosher diet
sufficiently nutritious in the court's and the court's advisor's
opinions).[22]  However, unsatisfied with the aforesaid relief,
Plaintiff re-amplified his demands for meals which, in addition
to the above-listed items, would: (a) also include cereals of his
choice and his preferred dried (rather than fresh) fruits; and
(b) be handled not by the prison staff but directly delivered to
him from a kosher kitchen facility.  See id., Docket Entry No.
167.  In response, citing Ochs v. Thalacker, 90 F.3d 293, 296
(8th Cir. Iowa 1996) (urging the courts to weed out "false
religious claims that are actually attempts to gain special
privileges or to disrupt prison life"), the prison officials:

---

[22] This Court stresses that the Court's summary of the
decisions entered by the Eastern District of Arkansas shall not
be construed as an expression this Court's approval or
disapproval of a federal court's endeavor to compose an inmate's
menu, to assess its nutritional value, or to appoint a court's
"menu selection" advisor at defendants' cost.

(a)  asserted that Plaintiff was abusing the court's favorable
     determination in order to obtain items desired as a result
     of Plaintiff's personal dining preferences rather than
     mandated by his religious beliefs based on "practices and
     teachings which [were deemed by the Eighth Circuit to be]
     part of the Jewish faith [even though they did] not fit
     squarely with [the traditional] Judaism, in any of its
     forms";

(b)  pointed out that accommodation of Plaintiff's preference for
     having food not prepared by any prison staff was, literally,
     unattainable unless Plaintiff were to be supplied entirely
     with pre-packaged kosher food, prohibitively expensive in
     light of costing 2.8 times more than the subsistence of any
     other inmate;[23] and

---

[23] The prison officials' response provided an overview of
Plaintiff's prior and then-existing dietary demands, stating as
follows:

> [During the initial stages of his incarceration,
> Plaintiff was making] such statements as "They were
> pissing and spitting in my food, I could smell it and
> taste it in the food.  I could smell the spit in my
> coffee.  They brought a cat in one time and it pissed
> on my mixed vegetables.  I heard the cat out there and
> I heard them squeezing it." . . . Plaintiff is now
> objecting to the bread being provided to him [because
> he] believes that the way that the bread is packaged it
> can become contaminated, [but] Plaintiff does not
> explain . . . how it can become contaminated [since]
> the bread arrives to him in an unopened manner. . . .
> Additionally, Plaintiff has objected to the milk being
> provided him on the basis of spoliation [but he] does
> not give any explanation as to what he means by

    (c)    suggested Plaintiff's transfer to his current facility, in

          New Jersey, pursuant to the Interstate Compact, since this

          New Jersey facility was equipped to serve kosher needs of

          Jewish inmates.  See id., Docket Entries Nos. 168, 183.

          Plaintiff, however, vigorously resisted the transfer,

asserting as follows:

> [The prison officials] notified Plaintiff . . . that
> [they] had received consent from the New Jersey
> Department of Correction to transfer Plaintiff to a
> correctional facility in New Jersey. [The prison
> officials] contend that the New Jersey Department of
> Correction provides kosher foods to Jewish inmates and
> would similarly provide kosher foods to [Plaintiff,
> but] Plaintiff objects to this transfer [because]: (a)
> Plaintiff is not Jewish and he will likely be treated
> differently by the New Jersey Department of Correction,
> its staff, and its Jewish inmates because he has not
> been recognized as having legitimately converted to
> that faith . . . . (b) There have been no assurances
> that the New Jersey Department of Correction will
> comply with the relief granted [to] Plaintiff in [the
> form of peanut-butter-and-bread-on-Saturday] or the
> permanent relief granted [in the form of kosher menu].

Id., Docket Entry No. 171; see also id., Docket Entry No. 172

(reciting, effectively, the same conjecture).

------------------

> spoliation.  Plaintiff is being provided single cartons
> of kosher milk unopened [and the] milk . . . is not
> spoiled [in the sense that it is fresh].  Recently, . .
> . Plaintiff refused the milk, tomatoes, squash, and
> pear [asserting that] they were not prepared properly.
> . . .  Plaintiff has requested that a microwave be
> carted outside of his cell to heat [his pre-packed
> kosher meals].

Love v. Evans, Civil Action No. 00-0091 (E.D. Ark), Docket Entry
No. 186, at 3-7.

While noting that it had "reservations about allowing the [Arkansas Department of Corrections] to transfer [Plaintiff] some thousands miles away to a prison facility in New Jersey," the Eastern District of Arkansas also noted the high cost of serving Plaintiff with *three* pre-packed heatable meals a day, and stated:

Deciding between [the option of interstate transfer and that of three costly pre-packaged heatable meals] is not an easy task for the Court. [However], it is inappropriate for [Plaintiff] to insist on the costly [three pre-packed heatable meals a day] arrangement[] to be implemented to satisfy his religious-based dietary requirements while refusing a transfer that would provide him with access to a fully kosher diet at no continuing cost to the [Department of Corrections]. To satisfy the pre-packaged food option, the [Department of Corrections] proposes to obtain pre-packaged kosher meals from My Own Meals, Inc. [which] are fully cooked[,] can be stored at room temperature . . . and are packaged in plastic containers with lids. [The Department of Corrections] proposes to purchase a microwave to heat the meals for [Plaintiff] in the [prison] kitchen. [However,] to heat the meal in a microwave, the corner of the lid must be lifted up to allow steam to escape and then pushed backed down after the cooking is complete. [Plaintiff is] concern[ed] about possible contamination in the [prison's] non-kosher kitchen when the lids on the meals are removed to allow steam to escape during microwaving. [So, to ensure that the steam-releasing openings would not be contaminated by being at the prison's non-kosher kitchen, Plaintiff] sought access to a microwave to observe the meals being cooked. The My Own Meals website indicates that the meals can be heated either in a microwave, a vertical steamer, or by dropping them in boiling water. Presumably, the meals can be boiled in water in their original packaging without the necessity for venting. . . . Thus, in the event these pre-packaged meals are used, the [prison] is directed to heat them in boiling water and serve them to [Plaintiff] unopened. The main disadvantage to the pre-packaged meal option is the cost. . . . [Since] reducing the pre-packaged meal to one per day would further reduce the expense [if Plaintiff] wishes

Page -34-

to remain [in the State of Arkansas, he should] agree
to a diet consisting of cereal, powdered milk [since he
refuses to accept cartons with milk out of fear of
contamination] and juice for breakfast, and one
pre-packaged [heated-in-boiling-water] meal per day,
either for lunch or dinner.  That leaves one meal
missing.  For that meal, [Plaintiff] can be provided
with additional cereal, [powdered] milk and extra
peanut butter and crackers.  In addition, [he] should
be provided with the dried fruit [that] he requested,
at both [cold] meals [since] this diet [proposed by the
Eastern District of Arkansas is such that the Eastern
District of Arkansas in concerned that the diet might
be] lacking in fruits and vegetables.  [Plaintiff] is
directed to elect between accepting an interstate
transfer to a New Jersey facility, where he will be
provided with a kosher diet, or accepting the less
costly version of the prepackaged meal option outlined
[above.  He] shall advise the [Eastern District of
Arkansas] of his preference.

Id., Docket Entry No. 183.[24]

        In response, Plaintiff, acting through his court-appointed

counsel, elected in favor of transfer to New Jersey by stating:

Plaintiff has been provided with assurances that he
will be provided with a kosher diet . . . without the
standard prerequisite of a certification by a rabbi in
the New Jersey Department of Corrections. [The Office
of] Attorney General for the State of New Jersey [also]
confirmed that [P]laintiff would receive a kosher diet
regardless of his classification within the Department.
. . .   The kosher food provided by the New Jersey
Department is *exclusively vegetarian*. . . . Plaintiff
[was duly informed] of the above referenced terms and
conditions of his receipt of a kosher diet . . . .

Id., Docket Entry No. 187 (emphasis supplied).

--------

[24]  The Court underscores that this Court's quotation of the
decision entered by the Eastern District of Arkansas shall not be
construed as an expression this Court's approval or disapproval
of a federal court's endeavor to negotiate menu items or provide
cooking instructions, etc.

How to address the "moving target" of Plaintiff's
self-proclaimed religious beliefs is a matter of some concern,
granted that: (a) his dietary requests progressed from a peanut-
butter-and-bread-on-Saturday accommodation to a fully-kosher diet
and now yielded a new set of requirements that demands
sufficiently "festive meals" consisting of multiple courses
(including kosher meats, Plaintiff's own selection of fruits,
vegetables and deserts) that would be served together with a
pillow, for Plaintiff to lean upon during his process of meal
consumption; and (b) his unique religious beliefs keep evolving
in the way which this Court cannot neither establish with any
degree of certainty nor predict with any reasonable
approximation.

However, this Court is mindful of the Court of Appeals'
guidance that "the District Court [should] not . . . interject
itself into [religious] doctrinal disputes[; rather,] the
district court [can] properly determine only whether [the
plaintiff] sincerely held his religious beliefs, not whether his
beliefs are doctrinally correct or central to a particular school
of [religious] teaching [with which the plaintiff elects to
associate himself]." DeHart v. Horn, 227 F.3d 47, 50 (3d Cir.
2000) (quoting the memorandum opinion registered as DeHart v.
Horn, 127 F.3d 1094 (3d Cir. 1997) (mandate published without
opinion), which – in turn – relied on Employment Division v.

Smith, 494 U.S. 872, 886-87 (1990)); accord Patrick v. Le Fevre, 745 F.2d 153, 159 (2d Cir. 1984) (the sincerity and nature of the plaintiff's beliefs shall remain a question of fact even if the record indicates the plaintiff's "disdain for formal accouterments of religious worship and the propinquity of the perception [that the plaintiff's] faith [is not a religious belief but merely] a 'way of life'").

Thus, this Court presumes – for the purposes of this Opinion only and without making a factual finding – that Plaintiff's evolving beliefs are sincerely held, they could be qualified as those of a religious nature and, correspondingly, regardless of any incongruence (or of the magnitude of such incongruence) between his perceptions and the traditional tenets of Jewish Laws, Plaintiff's claims (and his demands for relief) are rooted in religious beliefs cognizable under the First Amendment.[25]

─────────────

[25] For instance, at this juncture, the Court cannot even guess whether Plaintiff's "own" Sabbath still falls on Sunday (and, hence, requires a Sabbath service by a rabbi ministering Sabbath on Sunday, which – at the very least– would be a violation of any traditional Jewish rabbi's religious beliefs and, hence, of that rabbi's First Amendment rights) or whether Plaintiff's Sabbath had shifted, at some point in the past, twenty-four hours forward to coincide with the traditional Jewish Sabbath (or whether Plaintiff's "own" Sabbath transgressed any other direction).  Granted such built-in ambiguity, this Court, unlike the Eastern District of Arkansas or the Court of Appeals for the Eighth Circuit, does not find it appropriate to address whether or not Plaintiff's past (or currently existing) set(s) of religious beliefs could, moreover should, be qualified as "adhesion to practices and teachings of the Jewish faith." Rather, *since Plaintiff is seeking religious accommodations provided pursuant to the requirements of Judaism* (where these

ii.  *Prayers in Segregated Confinement*

The first line of Plaintiff's challenges detected by this Court pertains to Plaintiff's over-two-year period spent in segregated confinement.  With equal protection aspects of these challenges removed, Plaintiff's allegations can be reduced to the following claims:

(a)  Plaintiff's rights were violated because – slightly more than half-way into his segregated confinement – he, allegedly, experienced a three-month lull in having his weekly (presumably traditional Sabbath) prayer led by a rabbi.  Plaintiff does not assert that he was prevented, in any way, from rendering Sabbath prayers on his own or from reading Jewish religious books (or any other books), or from resting, relaxing, taking strolls or indulging in Sabbath activities other that listening to a ministered sermon and/or praying with (or under a supervision) of a rabbi.[26]  In other words, Plaintiff's claims can be reduced to the

---

requirements coincide with the current evolutionary state of his own religion), the Court assesses Plaintiff's claims accordingly.

[26] In traditional Judaism, Sabbath "is primarily a day of rest and spiritual enrichment."  See <<http://www.jewfaq.org/ shabbat.htm>>.  Consequently, Sabbath celebration "implies . . . relaxation [and/or] sharing time with loved ones [and/or] enjoying the beauty of nature [and/or] eating a leisurely meal [and/or] visiting with friends and relatives [and/or] taking a leisurely stroll [and/or] reading [and/or] listening to music [etc.]"  See <<http://www.templesanjose.org/JudaismInfo/time/ Shabbat.htm>>.

statement that his Sabbaths were not as fulfilling as he desired, due to either: (i) the prison authorities' inability to fill the position of Rabbi Goldenberg swifter then within three months after Rabbi Goldenberg's departure; or (ii) Rabbi Spritzer's inability to begin individualized ministered sermons with segregated inmates in a speedier fashion (that is, if the Court were to generously presume that Rabbi Spritzer's services were retained markedly sooner than within three months after Rabbi Goldenberg's departure);

(b) Plaintiff's rights were violated because Rabbi Spritzer, while resuming weekly services with Plaintiff within three months after Rabbi Goldenberg's departure, did not attend/ partake-in/supervise Plaintiff's individual daily prayers on non-Saturday (non-Holy Days) mornings, as a result of which Plaintiff found his daily morning prayers less satisfying that what he desired; and

(c) Plaintiff's rights were violated because Rabbi Spritzer resumed weekly services, but these resumed services were not as lengthy as Plaintiff preferred them to be.[27]

---

[27] The Court notes, in passing, the facial anomaly of Plaintiff's claim asserting his displeasure with the "undue shortness" of the Sabbath services he was provided with, since – if such claim were to succeed – federal district courts would have to establish "minimum" lengths of religious services for each particular occasion, in each faith. Such an act of judicial activism would fly not only in the face of the Court of Appeals'

Alternatively, the totality of these three claims could be construed (especially in light of Plaintiff's complaints to the Chaplaincy Department expressing his dissatisfaction with Rabbi Spritzer's position that the services provided to Plaintiff were sufficient, from a religious point of view, to meet the requirements of the Jewish faith) as a single overarching claim that Plaintiff's rights were violated as a result of him not being ministered/serviced by a "rabbi" sharing, in each and every respect, Plaintiff's unique religious beliefs based on his own reading of the Old Testament, be it as to a "mandatory" minimum length of Sabbath prayer (and the day of such Sabbath), or as to a "mandatory" rabbi's presence at each daily morning prayer, or as to a "mandatory" daily rabbi's ministering without gaps (i.e., either without any gap, ever, or without gaps lasting up to three months), etc.

However, regardless of how the Court construes Plaintiff's allegations, they are subject to dismissal for failure to state a claim upon which relief can be granted.

The Free Exercise Clause guarantees substantive right but does not guarantee that all religious sects will be treated alike in all respects.  See Cruz v. Beto, 405 U.S. 319 (1972).  While prisoners must be given reasonable opportunity to exercise their

---

guidance that "the District Court [should] not . . . interject itself into [religious] doctrinal disputes," DeHart v. Horn, 127 F.3d 1094, but also in the face of the Establishment Clause.

faith, the Constitution does not require that a religious adviser be provided to cater to every sect/sub-sect in the penitentiary, nor does the Constitution require that prisoners be provided with a religious adviser of their choice or with the one belonging to their unique religious sect/sub-sect (or sharing their unique religious views).  See Blair-Bey v. Nix, 963 F.2d 162 (8th Cir.), rehearing en banc denied, 1992 U.S. App. LEXIS 13457 (8th Cir.), cert. denied, 506 U.S. 1007 (1992); see also Allen v. Toombs, 827 F.2d 563, 569 (9th Cir. 1987) (a prisoner is not entitled to have the clergyman of his choice provided for him in the prison); Gittlemacker v. Prasse, 428 F.2d 1, 4 (3d Cir. 1970) (same); see also Pogue v. Woodford, 2009 U.S. Dist. LEXIS 75943 at *8 (E.D. Cal. 2009) (only when a prisoner's sole opportunity for group worship arises under the guidance of someone whose beliefs are significantly different from his own is there a possibility that the prisoner's free exercise rights are violated) (citing SapaNajin v. Gunter, 857 F.2d 463, 464 (8th Cir. 1988).

Therefore, to the extent that Plaintiff's allegations can be construed as an overarching claim that he was not provided with a rabbi whose beliefs were identical to the entire body of Plaintiff's unique and constantly-changing religious views, they are without merit and should be dismissed accordingly.[28]

---

[28]   If the Court were to assess this claim in light of the Turner factors, see 482 U.S. at 89, the anomaly of Plaintiff's claims becomes even more pronounced, since all Plaintiff's

Construed individually, Plaintiff's claims are equally without merit since Plaintiff's mere dissatisfaction with the frequency of his services (_i.e._, that his individualized services were weekly rather than daily), or with the three-month lull in ministering, or with the length of sessions of the resumed weekly services, cannot state a cognizable First Amendment claim.  <u>See</u>, <u>e.g.</u>, <u>Adegbuji v. Green</u>, 280 Fed. App'x 144 (3d Cir. 2008) (an inmate's right to free exercise was not violated when, after having been attending four church services and bible study classes per week, he was eventually switched to one such meeting per week, because the limitation was reasonably related to legitimate penological interest in operation of facility, and the inmate was not barred from practicing his religion but merely limited in the number of religious meeting per week that he could attend); <u>Weir v. Nix</u>, 114 F.3d 817 (8th Cir. 1997) (free exercise rights of an inmate were not violated by prison policies which limited the inmate's sermoned activities to three hours of congregational worship per week, conducted on Fridays instead of

---

pleadings show that he was invariably provided with alternative means of exercising his religious rights during his segregated confinement, while the prison officials had no readily-available (or even available-at-great-cost) means to accommodate his desire for having a "rabbi" sharing his beliefs: upon the Chaplaincy Department's inquiry (and upon Rabbi Spitzer's inquiry) as to the identity/contact information of the rabbis sharing Plaintiff's unique faith, Plaintiff was, seemingly, unable to name any such rabbi.  Therefore, the prison officials were, by definition, unable to retain the services of someone who did not exist.

Sundays, the inmate's holy day); <u>Walker v. Mintzes</u>, 771 F.2d 920 (6th Cir. 1985) (a temporary elimination or reduction of religious services resulting from an administrative need does not violate First Amendment rights of prisoners); <u>see also</u> <u>Hadi v. Horn</u>, 830 F.2d 779 (7th Cir. 1987) (occasional cancellation of religious services due to scheduling conflicts did not violate rights of inmates); <u>accord</u> <u>Baranowski v. Hart</u>, 486 F.3d 112 (5th Cir.) (where a prisoner was denied rabbi-led services or ministering by a rabbi for two months, and then was provided with once-a-month services and services on 23 Holy Days, his rights were not violated because he retained his ability to participate in alternative means of exercising his religious beliefs – by being given access to religious materials in his cell and occasional access to the lockers containing religious materials), <u>cert.</u> <u>denied</u>, 552 U.S. 1062 (2007).

Here, Plaintiff does not assert that he was denied access to religious material of his choice during his segregation, or that he was prevented from ordering such material from the library/outside sources.  Similarly, he does not assert that he was forced to partake in activities contrary to the Jewish faith, or prevented from engaging in activities mandated by the Jewish faith (e.g., rendering three-times-a-day daily prayers, consuming kosher meals, avoiding non-kosher items, observing Sabbath requirement for a weekly day of leisure, etc.).  Moreover, he

concedes that, short of a three-moth lull (associated with the
prison officials' need to find a "replacement rabbi" after Rabbi
Goldenberg left his position as the prison's Jewish Chaplain),
Plaintiff was provided with a weekly personal ministering by a
Jewish rabbi.

The totality of these circumstances unambiguously indicates
that: (a) Plaintiff was provided with a substantial number of
alternative means to exercise Jewish religious beliefs (with,
seemingly, numerous additional accommodations of his own, unique,
religious beliefs, such as having a Sabbath on Sunday); and (b)
the prison's accommodation of Plaintiff's preferences for
services corresponding exactly to his unique religious beliefs
would unduly burden the prison's resources.  Cf. Ward v. Walsh, 1
F.3d 873, 1993 U.S. App. LEXIS 19576, at *8 and 16-17 (9th Cir.
1993) (the prison was not obligated to obtain services of an
Orthodox rabbi for an Orthodox Jewish inmate where there was "no
Orthodox Jewish rabbis within a one hundred mile radius of the
prison," and "[t]he district court heard testimony from an
Orthodox Jewish rabbi that private prayer is a significant aspect
of the practice of the Jewish religion").  Therefore, Plaintiff's
dissatisfaction with the religious services fails to state a
claim, see Turner, 482 U.S. at 89-90, and his challenges based on
such dissatisfaction will be dismissed with prejudice, see Smith
v. Kyler, 295 Fed. App'x 479 (3d Cir. 2008) (affirming dismissal

of an inmate's claim challenging denial of weekly group service, because the inmate's constitutional rights were not violated if he had such alternatives as maintain religious materials in his cell, seeking an exemption from the hair grooming regulations, and occasional personal meetings with a religious advisor available to him in lieu of a weekly worship service), cert. denied, 129 S. Ct. 2837 (2009), since the facts asserted in his multiple submissions indicate that he cannot cure this deficiency by re-pleading.

### iii. *Reentry into the General Population*

Plaintiff's next line of claims could be summarized into two statements, i.e. upon his reentry into the general population from segregated confinement, Plaintiff was displeased with: (a) the need to obtain re-clearance to access the balcony area where Jewish inmates congregated for prayer; and (b) with the need to wait for getting such re-clearance administratively processed for the period of seven weeks (which ensued from an erroneous forwarding of Plaintiff's application for re-clearance to a wrong prison department, and Plaintiff's corresponding need to refill and resubmit the application forms).

This line of claim is also without merit. Here, Plaintiff does not challenge a prison regulation, policy, custom or decision: he merely challenges an asserted insufficiency of prison administrative processes that resulted in a single

accident of mis-forwarding.  Such allegations do not state a
viable claim, since prison officials simply cannot be held liable
on allegations which fail to assert that there was an affirmative
policy or custom, or decision, or regulation, enforced by the
defendants, the enforcement of which resulted in an alleged
infringement upon the prisoner's rights.[29]  See, e.g., Andreola
v. Wisconsin, 211 Fed. App'x 495 (7th Cir. 2006) (prison
officials cannot be liable for not providing kosher meals to a
prisoner unless the prisoner alleges facts showing that such
denial was a result of defendants' affirmative decision, policy
or custom), rehearing denied, 2007 U.S. App. LEXIS 5281, cert.
denied, 552 U.S. 852 (2007); Lovelace v. Lee, 472 F.3d 174, 201
(4th Cir. 2006) (holding "that negligent acts by officials
causing unintended denials of religious rights do not violate the
Free Exercise Clause"); Abdulhaseeb v. Calbone, 600 F.3d 1301,
1320-21 (10th Cir. 2010) (an isolated mistake is also not an

---

[29] If the Court were to hypothesize that Plaintiff wished to
challenge not the delay associated with the mis-forwarding of his
application for clearance but the very requirement mandating
Jewish inmates to apply for such clearance, Plaintiff's claims
would also be subject to dismissal.  See Resnick v. Adams, 348
F.3d 763 (9th Cir. 2003) (dismissing prisoner's claims upon
applying the Turner balancing test and concluding that the prison
regulation requiring an application process for a prisoner to
receive kosher meals was not a constitutional violation,
especially since: (a) the prisoner's allegations showed the
prison officials' willingness to work with him in meeting his
needs; (b) a prisoner's ability to receive a kosher diet without
filing an application would have frustrated the prison's orderly
administration; and (c) there was no obvious or easy alternatives
to the application process).

actionable basis for a Free Exercise claim); <u>Gallagher v.
Shelton</u>, 587 F.3d 1063, 1070 (10th Cir. 2009) (same); <u>accord
Anspach v. City of Philadelphia</u>, 503 F.3d 256, 273 n.12 (3d Cir.
2007); <u>Boles v. Neet</u>, 2009 U.S. Dist. LEXIS 90019 (D. Colo. Mar.
13, 2009).  Hence, these allegations will be dismissed; and - in
light of the facts asserted by plaintiff indicating that prison
officials' willingness to provide Plaintiff with requested re-
clearance – these claims will be dismissed with prejudice.

       iv.  *Around-the-clock Possession of Tallit*

Plaintiff next claims that he was denied the opportunity to
keep his tallit in his cell, and that this deprivation hindered
his frequent, spontaneous afternoon and evening prayer
sessions.[30]

Plaintiff describes his prayer tallit as a piece of fabric
sizeable enough to wrap either the entire body of the worshiper
or, at the very least, a substantial part of the worshiper's body
(and, pursuant to traditional Judaism, it is necessarily worn
being loosely wrapped over, <u>i.e.,</u> on top of, one's clothing).

---

[30] Plaintiff's Amended Complaint and his proposed re-amended
complaint indicate that a few tallits dispensed to other Jewish
inmates (being either privately owned by inmates or the property
of the institution where Plaintiff is held) are dispensed only to
the Jewish inmates held in the general prison population and only
during their congregational morning prayer; at all other times,
tallits are in safekeeping (seemingly, in the prison's Chapel/the
area dedicated to Jewish congregational services) for the reasons
associated by prison officials with security concerns.  <u>See</u>
Docket Entry No. 10, at 9; <u>see also</u> Docket Entry No. 13-2, at 9.

Thus, it is necessarily concealing – at the very least -- the top
of the worshiper's head, his neck and arms, and even the top of
his chest and back areas.  As such, it could easily serve as a
cover for any contraband items or weapons that the worshiper
might hold/conceal in the hands or attach to his lower-and-upper-
arm/head/chest/upper-back areas.  Therefore, the security
concerns implicated by the Turner considerations,[31] weighed
against the other Turner considerations implicated in this issue,
render the modest limitation challenged by Plaintiff valid under
the First Amendment.  See Rogers v. Scurr, 676 F.2d 1211 (8th
Cir. 1982) (prison rule preventing inmates from wearing prayer
robes outside of prayer services area does not violate First
Amendment rights of prisoners since the rule is justified by
prison policy of prohibiting contraband which could be easily
hidden in such robes); Butler-Bey v. Frey, 811 F.2d 449, 1987
U.S. App. LEXIS 1960 (8th Cir. Mo. 1987) (prison regulation
prohibiting constant wearing of headgear did not violate the
inmate's right to freedom of religion since the regulation was a
reasonable security measure); Abdullah v. Kinnison, 769 F.2d 345
(6th Cir. 1985) (prison directive restricting use of full length
hooded prayer robes to institutional chapel does not violate

---

[31] The Court notes that Plaintiff does not specify how he
wears his tallit during prayer.  Because of the inherently
concealing nature of a tallit, and because of the unique and
evolving nature of Plaintiff's religious beliefs, the Court
cannot say that the prison's security concerns are misplaced.

constitutional rights of inmates, since it is justified by sound
security considerations, which are normally entrusted to the
discretion of prison administrators); see also Willard v. Hobbs,
2009 U.S. Dist. LEXIS 71244 (E.D. Ark. July 23, 2009) (finding
that the prison officials clearly had a legitimate penological
interest in prohibiting an inmate to wear a large altar cloth on
security grounds and specifically observing that since such altar
cloth were similar to a tallit in the sense that both could be
used to cover the worshiper's head/shoulders and hide one's
appearance/contraband).

Here, Plaintiff's submissions unambiguously indicate that he
was and is allowed to wear his tallit during his morning prayers
(that is, while he is in the designated/supervised balcony area
with other Jewish inmates attending congregational services).
Plaintiff's submissions also unambiguously indicate that he was
and is allowed to pray in his cell during the remainder of the
day, which he admits doing at least three times a day and,
seemingly, as often as he wishes.  The totality of these
circumstances paint a picture where Plaintiff is provided with an
ample set of means to worship.  Conversely, allowing Plaintiff to
have a tallit around-the-clock at his disposal, kept in his cell,
would trigger grave security concerns, and – since it is
excessively burdensome for the prison authorities to assign an
"private" correctional officer to monitor Plaintiff's use of his

tallit on a 24/7 basis, the narrowly-tailored limitation allegedly imposed upon Plaintiff facially meets the Turner considerations.  Therefore, this line of Plaintiff's claims is meritless and will be dismissed, with prejudice since Plaintiff's claims cannot be cured by repleading.

> v.   *Passover 2009 and Second Seder of 2010*

The next line of Plaintiff's claims arises from the events of two Passover celebrations.  The first of these celebrations entailed the first and second Seders of 2009, and the second celebration was related to the second Seder of 2010.

With regard to the former, Plaintiff concedes that he was provided with the entire set of ritual and food items, as traditional Judaism perceives these items, but he asserts that he was: (a) not furnished with a special "Passover pillow" to lean upon while consuming his meal; and (b) served with a non-extensive menu that failed to make him feel sufficiently "festive."[32]

With regard to the second celebration, that is, the second Seder of 2010, Plaintiff concedes that he partook in the entirety of the traditional Seder service (which, by definition, had to

---

[32]  Plaintiff's voluminous submissions are are silent as to whether Plaintiff was served with a kosher dinner, in addition to the Passover "treat" he received. Although the Amended Complaint suggests that he received such a dinner for at least the second Seder of 2010, this Court presumes, out of an abundance of caution, that the first and second Seders of Passover 2009 were limited solely to the "treats" he received.

incorporate a Passover "treat" necessary for the Seder order)[33]
but remained dissatisfied with the kosher-for-Passover vegetarian
pre-packed meal served to him in addition to that service,[34]
finding that the meal he received was insufficiently "festive" to
meet Plaintiff's unspecified perceptions as to what should be the
exact content of a Passover Seder.

Admittedly, this line of Plaintiff's claims gives the Court

---

[33]  In traditional Judaism, a Passover Seder is viewed as a
religious ritual incorporating consumption of certain traditional
food items, rather than a mere dining experience.  Therefore,
there is a rather strict traditional "Seder order," mandating
that the ritual to begin with reading of "Kadeish" blessings and
consumption of the first cup of wine, then "Ur'Chatz" (ritual
washing of hands), followed by dipping a vegetable into either
salt water, vinegar or "charoset," then breaking the middle layer
of matzoh, followed by telling the story of Passover, then re-
washing hands, reading blessings, consuming matzoh, charoset and
bitter herbs, then eating the remainder of the meal served
(whatever this remainder might be, but it should have at least a
hard-boiled egg), after which "Tzafun" (the last morsel of food,
typically matzoh) is consumed and "Bareich" (a post-meal "Grace")
is read, followed by singing "Hallel" praise and closing with
"Nirtzah" prayers.  See, e.g., Seder Hagadah: Domestic Service
for the Eve of Passover (Leopold Stein, transl, Adolph Moses ed.)
(1907).  Therefore, one's partaking in a traditional Seder
necessarily implies one being served with wine/grape juice,
matzoh, bitter herbs, charoset, egg, etc.  Although Plaintiff's
submissions did not detail the elements of the second Seder he
was provided with in 2010, it appears that all traditional items
necessary to conduct of such Seder were served to him, the Court
presumes that a proper "treat" was served: granted that
Plaintiff's claims as to that particular celebration are limited
solely to the allegedly insufficient "festiveness" of the kosher-
for-Passover meal provided to him rather than lack of "treat."

[34]  Plaintiff's claim is belied by the fact that the
transferring court expressly advised him, prior to his acceptance
of transfer to New Jersey, of the exclusively vegetarian Kosher
menu served by his current place of confinement.

the most pause, since there is a qualitative difference between:
(a) one's sincere beliefs in the prescripts of Torah and Talmud
(or – selectively – in the Tanakh only, or only in the Old
Testament part of the Bible); and (b) one's, no-matter-how-
fervent, adhesion to the guidance provided in Gil Marks,
Encyclopedia of Jewish Food (2010), or analogous culinary
volumes, since the former qualify as bases for religion or, at
the very least, as "a" set of religious beliefs, see DeHart, 227
F.3d at 52, while the latter qualify, at most, as an expression
of one's gourmet preferences.  See Africa v. Commonwealth of
Pennsylvania, 662 F.2d 1025, 1030 n.9 and 1032 (3rd Cir. 1981)
("First, a religion addresses fundamental and ultimate questions
having to do with deep and imponderable matters.  Second, a
religion is comprehensive in nature; it consists of a
belief-system as opposed to an isolated teaching.  Third, a
religion often can be recognized by the presence of certain
formal and external signs") (quoting L. Tribe, American
Constitutional Law 859 (1978), and Theriault v. Carlson, 495 F.2d
390, 395 (5th Cir.), cert. denied, 419 U.S. 1003 (1974), and
citing Giannella, Religious Liberty, Nonestablishment, and
Doctrinal Development: Part I, The Religious Liberty Guarantee,
80 Harv. L. Rev. 1381, 1417-18 (1967), and Comment, The Religious
Rights of the Incarcerated, 125 U. Pa. L. Rev. 812, 861 n.306
(1977), for the observations that the First Amendment does not

protect "so-called religions which tend to mock established institutions and are obviously shams and absurdities and whose members are patently devoid of religious sincerity," and sincerity inquiry is "especially important in prison free exercise cases because the bleakness of institutional life may create an incentive falsely to allege religious motivation for acts" otherwise forbidden by prison authorities).

However, out of abundance of caution and being mindful of Plaintiff's pro se litigant status, the Court presumes – for the purposes of this Opinion only and without making a factual finding – that this line of Plaintiff's claims (alleging that the menu served to him was insufficiently extensive or elaborate) was not insincerely made.

Yet, even with such generous allowance, Plaintiff's allegations that the "treats" served to him during the first and second Seders of 2009 and the kosher-for-Passover meal served to him during the second Seder of 2010 were not elaborate or not extensive enough to meet Plaintiff's own definition of "festiveness" fail to state a claim.  First, a grant of Plaintiff's request to allow him to select his own menu (in which, he pointed out, Plaintiff desired to include not only unspecified variety of his preferred fruits and vegetables, but also unspecified kosher meat dishes and unspecified deserts) would open a floodgate imposing undue administrative burdens and

facially excessive costs on the prison administrators.  See Udey
v. Kastner, 805 F.2d 1218 (5th Cir. 1986) (prisoner's first
amendment right to be provided with diet consistent with his
sincerely held religious beliefs is outweighed by state's
interest in avoiding proliferation of similar claims which would
probably result if plaintiff's request were granted, since the
number of unusual, burdensome and costly religious dietary
requests by inmates has been "grow[ing] by leaps and bounds");
see also Williams v. Morton, 343 F.3d 212 (3d Cir. 2003) (where
Muslim inmates provided with vegetarian meals asserted violation
of their religious beliefs and demanded service of Halal meat
dishes, the Court of Appeals agreed with the district court that
the decision to provide vegetarian Halal meals, rather than Halal
meals with meat, was rationally related to the legitimate
penological interests in simplified food service, security, and
staying within the prison's budget; the Court pointed out that a
situation where a single inmate requests only a cup of soy milk
to be added to food already purchased by the prison is
qualitatively different from the scenario where many prisoners
request Halal meals with meat); accord Baranowski, 486 F.3d 112
(prison officials were not required to respond to particularized
dietary requests when cost prohibitive and administrative
burdensome).

Second, the fact that prisoners' meals are not elaborate

enough to meet the prisoners' dining preferences cannot serve as
the basis for a viable claim.  See DeHart v. Horn, 390 F.3d 262
(3d Cir. 2004) (prison officials' denial of an inmate's request
for a diet free of meat, dairy products and pungent vegetables,
that would be consistent with his Buddhist beliefs, was
reasonably related to the prison's legitimate interest in
efficient food provision because such diet would require special
ordering of certain foods that were costly and burdensome, and
there was no obvious and easy alternative with only de minimis
cost to prison available to meet the inmate's unique set of
requests); see also Tisdale v. Dobbs, 807 F.2d 734 (8th Cir.
1986) (First Amendment rights of Muslim prisoner were not
violated where, after daily religious fast, he was provided with
a "sack lunch" consisting of two bologna sandwiches, since the
facts alleged did not suggest that he could not eat these
sandwiches, e.g., because he was vegetarian or because bologna
was made of pork which he could not eat); see also Patel v.
United States Bureau of Prisons, 515 F.3d 807 (8th Cir. 2008)
(affirming dismissal of an inmate's claims since the inmate did
not explain why less expensive food items prepared in accordance
with the inmate's religious beliefs could not serve as a
substitute for kosher meat entrees); accord Johnson v. Horn, 150
F.3d 276 (3d Cir. 1998) (while prison officials are required to
provide Jewish inmates with "a" nutritionally sufficient kosher

diet, service of cold diet did not violate the inmates' rights because they were not entitled to hot kosher meals), <u>overruled on other grounds</u>, <u>DeHart v. Horn</u>, 227 F.3d 47; <u>Kretchmar v. Beard</u>, 241 Fed. App'x 863 (3d Cir.) (dismissing an inmate's appeal since the Third Circuit precedent made it clear that inmate's rights were not violated by fact that he was served non-rotating menu of cold food items in response to his request for Kosher diet), <u>cert. denied</u> 552 U.S. 1049 (2007).

As one court observed, while dismissing claims analogous to those raised by Plaintiff,

> Much of [the inmate's] objection to the diet has been advanced in general terms: kosher meals were less varied than [what he desired], had a paucity of seasonal fruits and vegetables, included wilted or even rotten items on occasion, and entirely lacked certain items found on the regular menu [such as] macaroni salad or potato salad, cucumbers, peppers, or tomatoes, watermelon, cantaloupe or baked potatoes.  Macaroni salad seems to be of particular significance to [the inmate, since he even submitted grievances in order] to see if macaroni salad could be added to the kosher menu for the next seasonal menu.  The specific instances gleaned from his pleadings and grievances [include occurrences when he] received a warm sandwich that, [he believed] should have been "cool/crisp," along with a "green orange" and a "nasty" carrot/cabbage salad [or when] he was served salad dressing that was not kosher, [or when his] lunch . . . included a salad that was "rotted and clearly smelled spoiled," [or when he had] two consecutive chicken suppers and three rice/soy bean meals in [a row, or when] he was served a "cold tray" that was warm with wilted carrot sticks, [or when] he received a turkey sandwich and rotted orange, while the [non-kosher inmates] had . . . macaroni salad. [The inmate's] claim . . . that the inadequacies in the kosher diet burdened his religious observance [are without merit because he] must show that defendants' conduct imposed a substantial burden on his religious

practice [under a statutory test, but his] scattered
and minor complaints about kosher meals [are]
insufficient, as a matter of law, to show that
defendants had imposed a substantial burden on his
religious exercise. . . . The complaints summarized
above reflect the inconvenience of non-preferred or
occasionally unsatisfactory items in a meal. We cannot
say that they constituted a substantial burden on [the
inmate's] practice of maintaining a kosher diet. . . .
As for his broader complaints about the variety,
quality, and rotation of the menu, such general
allegations are insufficient.

Strope v. Cummings, 381 Fed. App'x 878 (10th Cir. 2010) (footnote

2 incorporated in the main text, citations to case law and docket

entries omitted).

Here, as in Strope, Plaintiff's claims are based on his

displeasure with the variety or extent of the menu served, not on

an allegation that the menu served to him violated the

requirements of his kosher diet.[35]   To the contrary, he concedes

---

[35] The Torah directs Jews not to eat (or possess) "chametz"
during all seven days of Passover. See Exodus 13:3. "Chametz" is
"leaven," so any food that's made of grain and water that have
been allowed to ferment and "rise" would be "chametz." See
<<http://www.chabad.org/library/howto/wizard_cdo/aid/1755/
jewish/1-What-is-Chametz.htm>>. Since introduction of "chametz"
into a meal is deemed a very serious religious violation, Jews
take extra protective measures on Passover to prevent any
mistakes leading to such introduction; food items prepared in
accordance with such extra-care requirements are qualified as
"kosher-for-Passover." See id.  Plaintiff's allegations
unambiguously establish that the meals and "treats" served to him
in 2009 and for the second Seder of 2010 met this stringent
requirement.  In the event Plaintiff's unique, self-forged
version of religious beliefs required a particular sense of
"cheer" or "festiveness" to be supplied by that meal, this unique
requirement need not be met by the prison accommodations
comparable to those provided to the larger body of inmates
adhering to the traditional Jewish faith. See Gittlemacker v.
Prasse, 428 F.2d 1 (3d Cir. 1970) (prison superintendent had no

Page -57-

that the items served to him were in compliance with his religious beliefs, but he alleges that the meals were such, extent-wise or taste-wise, that Plaintiff did not attain a sufficiently "festive" spirit upon consuming these meals. Therefore, he invites this Court to direct Defendants to allow Plaintiff to order, from outside suppliers, multi-course dinner menus in the variety, amount and taste that would meet Plaintiff's sense of "festiveness" of mood.  The Court declines the invitation.  Allowing Plaintiff such a remedy would effectively give all inmates a carte blanche to dictate prison menus, and would subject prison budgets to the dietary whims of inmates.

Since Plaintiff does not assert that his consumption of the Passover "treats" or kosher-for-Passover vegetarian tray served to him forced him into committing a prohibited religious act (or prevented him from performing a mandatory religious act), his claims are subject to dismissal.  And, since the facts asserted by Plaintiff in conjunction with these claims are as extensive and detailed as they are facially meritless, these allegations will be dismissed with prejudice.

c.   *Passover 2008 and First Seder of 2010*

The foregoing analysis leaves the Court only with

_____

affirmative duty to provide, furnish, or supply every inmate with exact religious accommodations of the inmate's choice).

Plaintiff's line of claims based on: (a) the first and second Seders of 2008; and (b) the first Seder of 2010.

In determining the sufficiency of a complaint, the Court must be mindful to construe the facts stated in the complaint liberally. See Erickson v. Pardus, 551 U.S. 89 (2007); Haines v. Kerner, 404 U.S. 519 (1972); United States v. Day, 969 F.2d 39, 42 (3d Cir. 1992). Indeed, it is long established that a court should "accept as true all of the [factual] allegations in the complaint and reasonable inferences that can be drawn therefrom." Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997). However, while a court will accept well-pled allegations as true, it will not accept bald assertions, unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. See id.

In Phillips v. County of Allegheny, 515 F.3d 224, 230-34 (3d Cir. 2008), the Third Circuit addressed the revisions to pleading standards made by the Supreme Court in Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007). Specifically, the Court of Appeals observed as follows:

> "While a complaint . . . does not need detailed factual allegations, a plaintiff's obligation [is] to provide the 'grounds' of his 'entitle[ment] to relief' [by stating] more than labels and conclusions, and a formulaic recitation of the elements of a cause of action . . . ." Twombly, 127 S. Ct. at 1964-65 . . . Rule 8 "requires a 'showing,' rather than a blanket assertion, of entitlement to relief." Id. at 1965 n.3. . . . "[T]he threshold requirement of Rule 8(a)(2) [is] that the 'plain statement [must] possess

enough heft to 'sho[w] that the pleader is entitled to relief.'" _Id._ at 1966.  [Hence] "factual allegations must be enough to raise a right to relief above the speculative level." _Id._ at 1965 & n.3. . . . [Indeed, it is not] sufficient to allege mere elements of a cause of action; instead "a complaint must allege facts suggestive of the proscribed conduct." _Id._

_Phillips_, 515 F.3d at 230-34 (original brackets removed).

This pleading standard was further refined by the United States Supreme Court in _Ashcroft v. Iqbal_, 129 S. Ct. 1937 (2009), where the Court observed:

[In any civil action, t]he pleading standard . . . demands more than an unadorned ["]the-defendant-unlawfully-harmed-me["] accusation. [_Twombly_, 550 U.S.] at 555 . . . .  A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." [_Id._] at 555.  Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." _Id._ at 557. . . . A claim has facial plausibility [only] when the plaintiff pleads factual content . . . .  _Id._ at 556. [Moreover,] _the plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully._ _Id._ [_Indeed, even w_]here a complaint pleads facts that are "_merely consistent with_" a defendant's liability, [the so-alleging complaint still] "_stops short of [showing] plausibility of 'entitlement to relief.'_" _Id._ at 557 (brackets omitted). [_A_ _fortiori_,] the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions [or to t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements [,_i.e.,_ by] legal conclusion[s] couched as a factual allegation [e.g.,] the plaintiffs' assertion of an unlawful agreement [or] that [defendants] adopted a policy "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." . . . . [W]e do not reject these bald allegations on the ground that they are unrealistic or nonsensical. . . .  It is the conclusory nature of [these] allegations, rather than their extravagantly fanciful nature, that disentitles

> them to the presumption of truth. . . . [Finally,] the
> question [of sufficiency of] pleadings does not turn .
> . . the discovery process.  Twombly, 550 U.S.] at 559
> . . . . [The plaintiff] is not entitled to discovery
> [where the complaint alleges any of the elements]
> "generally," [i.e., as] a conclusory allegation
> [since] Rule 8 does not [allow] pleading the bare
> elements of [the] cause of action [and] affix[ing] the
> label "general allegation" [in hope to develop facts
> through discovery].

Iqbal, 129 S. Ct. at 1949-54 (emphasis supplied).

The Third Circuit observed that Iqbal provided the "final nail-in-the-coffin" for the "no set of facts" standard set forth in Conley v. Gibson, 355 U.S. 41, 45-46 (1957),[36] which was applied to federal complaints before Twombly.  See Fowler v. UPMC Shadyside, 578 F.3d 203 (3d Cir. 2009).  Since Iqbal, the Third Circuit has required the district courts to conduct, with regard to Rule 8 allegations, the two-part analysis:

> First, the factual and legal elements of a claim should be
> separated.  The District Court must accept all of the
> complaint's well-pleaded facts as true, but may disregard
> any legal conclusions.  [See Iqbal, 129 S. Ct. at 1949-50].
> Second, a District Court must then determine whether the
> facts alleged in the complaint are sufficient to show that
> the plaintiff has a "plausible claim for relief" [in light
> of the definition of "plausibility" provided in Iqbal.]  In
> other words, a complaint must do more than allege the
> plaintiff's entitlement to relief.  A complaint has to
> "show" such an entitlement with its facts.  See Phillips,

---

[36]   The Conley Court held that a district court was permitted to dismiss a complaint for failure to state a claim only if "it appear[ed] beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. at 45-46.  Under this "no set of facts" standard, a complaint could effectively survive a motion to dismiss so long as it contained a bare recitation of the claim's legal elements.

515 F.3d at 234-35.  As the Supreme Court instructed in
Iqbal, "[w]here the well-pleaded facts do not permit the
court to infer more than the mere possibility of misconduct,
the complaint has alleged-but it has not 'show[n]'-'that the
pleader is entitled to relief.'"  Iqbal, [129 S. Ct. at
1949-50 (emphasis supplied)].  This "plausibility"
determination will be "*a context-specific task that requires
the reviewing court to draw on its judicial experience and
common sense*." Id.

Fowler, 578 F.3d at 210-11 (emphasis supplied).

Assessing Plaintiff's claims (based on the events of the
first and second Seders of 2008 and the first Seder of 2010)
under the aforesaid standard is not an easy task.

With regard to his 2008 Seders, Plaintiff alleges that he
was not provided with a Passover "treat" for the first Seder and
his Passover "treat" for the second Seder consisted of grape
juice with the explanation that nothing else could have been
brought for security reasons.  Moreover, Plaintiff notes, without
specifying the date, that he was transferred to segregated
confinement sometime in March 2008, hence allowing for a
possibility that such transfer took place close to – or at the
very end of – March, and affected the security concerns as to the
Seders of 2008, which took place on April 19th and 20th, i.e.,
within just a few weeks after Plaintiff's transfer to segregated
confinement.  In other words, it appears that the "security
reasons" cited to Plaintiff by the Imam were a result of the
change in Plaintiff's custody status.  In addition, Plaintiff's
submissions (detailing each meal Plaintiff was served on all

pertinent days) invite a conclusion that Plaintiff's silence as
to what meals were served to him during the first and second
Seders of 2008 might be indicative of the fact that Plaintiff was
actually served with kosher-for-Passover meals (without Passover
"treats") on both those evenings, i.e., that Plaintiff was
provided with sufficient alternative means to celebrate Passover
2008 in light of his recently changed custody status, and no
actual policy/practice/regulation or even administrative decision
to actually deny him an opportunity to celebrate both Seders was
entailed.  However, Plaintiff's allegations might also be
construed as asserting that: (a) he was transferred into
segregated confinement in time for prison officials to obtain
security clearance for having him served with full Passover
"treat" (rather than with just grape juice only or with no
"treat" at all), and – in addition – lack of such "treat" was a
result of an actual policy/practice/regulation or decision by
Defendants to deprive him of a meaningful way to celebrate
Passover; and/or (b) Plaintiff was served with no dinner meal
whatsoever during the first and second Seders (or was served with
non-kosher-for-Passover meal), which left him unable to have any
alternative means to celebrate Passover.

Simply put, Plaintiff's statements seem to be at the
borderline of the "plausibility/possibility" distinction detailed
in Iqbal.  However, construing Plaintiff's allegations in light

most favorable to Plaintiff, the Court finds that this line of
claims might be defined, at the instant juncture, as plausible
under Iqbal.  Hence, the Court finds sua sponte dismissal of
these claims not in the interests of justice.

The Court's analysis of Plaintiff's claims associated with
the first Seder of 2010 is analogous.  While being: (a) mindful
of the possibility that Plaintiff's individualized request to the
Warden (seeking emergent temporary clearance to attend the area
where the Jewish inmates were scheduled to have their
congregational Passover Seder) might have taken place so late in
the day that Plaintiff could not have been cleared soon enough to
partake in the entirety of the Seder order; and (b) cognizant of
the fact that Plaintiff's statements as to his disappointment
with lack of a "festive" meal during that first Seder is likely
to be indicative merely of Plaintiff's dissatisfaction with lack
of variety (or insufficient, in his opinion, extensiveness) of
the meal offered to him, the Court – nonetheless – finds it
prudent to construe, at the instant juncture, Plaintiff's claims
based on the first Seder of 2010 as alleging that: (a)
Plaintiff's request for emergent clearance to attend the
congregational Seder celebration was made in time for prison
officials to ensure his presence during the entirety of Seder
order, and Plaintiff's late attendance was a result of an actual
policy/practice/ regulation or determination made by Defendants

to delay him; and/or (b) Plaintiff was served with no dinner meal whatsoever during that first Seder (or was served with non-kosher-for-Passover meal), which left him without alternative means to celebrate Passover on that particular evening. Consequently, the Court will not dismiss, at this juncture, Plaintiff's claims based on the events surrounding the first Seder of 2010.

However, granted the narrow-tailoring of the above-discussed two lines of claims, the Court: (a) stresses that these challenges as to past events not prone for repeat in the future present claims solely for damages (rather than injunctive relief); and (b) will direct termination of all Defendants in this matter except for the Imam and Christopher Holmes, since Plaintiff's allegations make it abundantly clear that all other named Defendants either had no connection with the events underlying these two narrow lines of claims or were connected to these events in such a way that these Defendants could not be liable to Plaintiff.[37]

---

[37] For instance, Plaintiff claims that the Warden is liable to him because she: (a) being a supervisor of prison personnel, failed to be so personally involved in the day-to-day operations of the prison facility to notice the error in forwarding Plaintiff's application for clearance to a wrong prison department; and/or and/or (b) failed to personally ensure Plaintiff's timely arrival at the congregational Seder, despite promptly authorizing his attendance when he raised the issue to her attention. Yet, these claims are facially deficient as to the Warden, since, under Iqbal, claims based on sheer respondeat superior liability are insufficient, and the Warden's action

### B.   Plaintiff's Allegation Related to Law Library Access

As noted in Section I(D)(3) of this Opinion, supra, one of Plaintiff's many filings executed in this matter is a "motion" seeking leave to re-amend his already "supplemented" and later amended Complaint.  The bulk of this "motion" presents a boiler-plate recital of legal standard for amendment of pleadings, and the sole vaguely asserted "fact" is limited to Plaintiff's bold conclusion that he was not provided with a sufficient access to a

---

aimed to ensure his participation in the Seders of 2010 cannot result in liability.  See, e.g., Cardinal v. Metrish, 564 F.3d 794 (6th Cir.) (affirming dismissal of 1983 claim alleging violation of an inmate's First Amendment rights because evidence established that, upon learning of the inmate's situation, his warden began procedures to transfer the inmate to facility which could accommodate his needs for kosher meals and segregation, and no facts alleged by the inmate suggested that the warden was affirmatively involved in the alleged denial of kosher food), cert. granted on other grounds, 130 S. Ct. 534 (U.S. 2009) (certifying the question whether the implicated statute is exempt from the reach of the Eleventh Amendment bar so an inmate asserting overcrowding of his cell may sue a public official in his/her public officer capacity).  Analogously, Plaintiff's claims against Sister Elizabeth are limited to the fact that she was supervising the congregational Seder (so to ensure orderly conduct by the inmates) and, in addition, was physically distributing Matzoh; Plaintiff, however, seeks to sue Sister Elizabeth for the content of the menu served during that Seder, even though the supervision of inmate's orderly conduct (or the mechanical act of distributing matzoh) has no connection whatsoever to making the decision as to what would or would not be served as part of the Seder menu. Hence, Plaintiff's multitude of such claims should be dismissed as to these and other Defendants, e.g., Doe who had no connection with what was or was not served during the Seders: the facts alleged must show each Defendant's *affirmative involvement* in the particular events underlying the exact Plaintiff's claims that was proceeded by the Court past the sua sponte dismissal stage.  See Iqbal, 129 S. Ct. at 1948.

law library.  As noted <u>supra</u>, this "motion" was accompanied by an
Exhibit demonstrating that Plaintiff had ample access to the
prison's law library.  The Court, therefore, is left to guess
whether Plaintiff intended this allegation to operate: (a) as an
additional claim; or (b) as a mis-identified brief accompanying
his motion to amend Plaintiff's already voluminous stack of
pleadings; or (c) as both, <u>i.e.</u>, an access claim and a motion
brief.

Out of abundance of caution, the Court elects in favor of
the latest construction.

### 1.    Construction as an Access-to-the-Courts Claim

The constitutional right of access to the courts is an
aspect of the First Amendment right to petition the government
for redress of grievances.  <u>See</u> <u>Bill Johnson's Restaurants, Inc.
v. NLRB</u>, 461 U.S. 731, 741 (1983).  In addition, the
constitutional guarantee of due process of law has, as a
corollary, the requirement that prisoners be afforded access to
the courts in order to challenge unlawful convictions and to seek
redress for violations of their constitutional rights.  <u>See
Procunier v. Martinez</u>, 416 U.S. 396, 419 (1974), <u>overruled on
other grounds</u>, <u>Thornburgh v. Abbott</u>, 490 U.S. 401, 413-14 (1989);
<u>see also</u> <u>Peterkin v. Jeffes</u>, 855 F.2d 1021, 1036 n.18 (3d Cir.
1988) (chronicling various constitutional sources of the right of
access to the courts).

Addressing the issue of inmates' right of access to the courts, the Supreme Court held that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers." Bounds v. Smith, 430 U.S. 817, 828 (1977).  The right of access to the courts is not, however, unlimited.  "The tools [that Bounds] requires to be provided are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement.  Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." Lewis v. Casey, 518 U.S. 343, 355 (1996) (emphasis removed).

Moreover, a prisoner alleging a violation of his right of access must show that prison officials caused him past or imminent "actual injury" by hindering his efforts to pursue a viable claim or defense directly or collaterally related to his criminal prosecution or his conditions of confinement.  See Lewis, 518 U.S. at 348-51, 354-55 (1996); Oliver v. Fauver, 118 F.3d 175, 177-78 (3d Cir. 1997); see also Salkeld v. Tennis, 248 Fed. App'x 341, 342 (3d Cir. 2007) (the injury requirement is not satisfied by just any type of frustrated legal claim).  "He might show, for example, that a complaint he prepared was dismissed for

failure to satisfy some technical requirement . . . .  Or that he had suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of [his conditions of confinement] that he was unable to file even a complaint."  Lewis, 518 U.S. at 351.

Consequently, in Christopher v. Harbury, 536 U.S. 403 (2002), the Supreme Court set forth specific criteria that a court must consider in determining whether a plaintiff has alleged a viable claim.  The Supreme Court stated that, in order to present a claim for denial of access to courts, the inmate must assert facts showing each of the following three elements: (1) a non-frivolous, underlying legal claim that the inmate was pursuing in connection with his criminal prosecution or his conditions of confinement; (2) that official acts successfully frustrated that litigation; and (3) an actual loss of claim or defense resulted from such official actions, thereby providing grounds by which the court could grant a remedy to compensate for the lost opportunity.  See id. at 415.

Here, Plaintiff seems to assert that, regardless of being granted extended access to the law library and filing an overly-voluminous Complaint and "supplement," plus his extensive Amended Complaint, plus two rounds of motions, Plaintiff was nonetheless deprived of his First Amendment access rights.  Plaintiff's allegations, if such were intended, are procedurally and

substantively deficient.

a.   *Procedural Deficiency*

Rule 20(a)(2) of the Federal Rules of Civil Procedure limits the joinder of defendants, and Rule 18(a) governs the joinder of claims.  <u>See</u> Fed. R. Civ. P. 18(a), 20(a)(2).  Rule 20(a)(2) provides:  "Persons . . . may be joined in one action as defendants if: (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action."  Fed. R. Civ. P. 20(a)(2)(A) and (B).  Rule 18 (a) provides : "A party asserting a claim . . . may join, as independent or alternative claims, as many claims as it has against an opposing party."  Fed. R. Civ. P. 18(a).  Wright & Miller's treatise on federal civil procedure explains that, where multiple defendants are named, the analysis under Rule 20 precedes that under Rule 18:

> Rule 20 deals solely with joinder of parties and becomes relevant only when there is more than one party on one or both sides of the action.  It is not concerned with joinder of claims, which is governed by Rule 18.  Therefore, in actions involving multiple defendants Rule 20 operates independently of Rule 18 . . .
>
> Despite the broad language of Rule 18(a), plaintiff may join multiple defendants in a single action only if plaintiff asserts at least one claim to relief against each of them that arises out of the same transaction or occurrence and presents questions of law or fact common to all . . .

Charles Allen Wright, Arthur R. Miller, Mary Kay Kane, <u>Federal
Practice & Procedure Civil 3d</u> §1655; <u>see also</u> <u>United States v.
Mississippi</u>, 380 U.S. 128, 143 (1965) (where county registrars
were alleged to be carrying on activities which were part of a
series of transactions or occurrences the validity of which
depended upon questions of law or fact common to all of them,
joinder of registrars in one suit as defendants was proper under
Rule 20(a)); <u>Ross v. Meagan</u>, 638 F. 2d 646, 650 n.5 (3d Cir.
1981), <u>overruled</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u>, <u>Neitzke v. Williams</u>, 490
U.S. 319, 328 (1989) (joinder of defendants is not permitted by
Rule 20 unless both commonality and same transaction requirements
are satisfied).  Consequently, a civil plaintiff may not name
more than one defendant in his original or amended complaint
unless one claim against each additional defendant is
transactionally related to the claim against the first defendant
and involves a common question of law or fact.  <u>See</u> Fed. R. Civ.
P. 20(a)(2).  As the United States Court of Appeals for the
Seventh Circuit recently explained, a prisoner may not join in
one case all defendants against whom he may have a claim, unless
the prisoner satisfies the dual requirements of Rule 20(a)(2):

> Thus multiple claims against a single party are fine,
> but Claim A against Defendant 1 should not be joined
> with unrelated Claim B against Defendant 2.  Unrelated
> claims against different defendants belong in different
> suits, not only to prevent the sort of morass that [a
> multi]-claim, [multi]-defendant suit produced but also
> to ensure that prisoners pay the required filing fees -

> for the Prison Litigation Reform Act limits to 3 the
> number of frivolous suits or appeals that any prisoner
> may file without prepayment of the required fees.  28
> U.S.C. § 1915(g) . . .
> A buckshot complaint that would be rejected if filed by
> a free person - say, a suit complaining that A
> defrauded the plaintiff, B defamed him, C punched him,
> D failed to pay a debt, and E infringed his copyright,
> all in different transactions - should be rejected if
> filed by a prisoner.

George v. Smith, 507 F. 3d 605, 607 (7th Cir. 2007).

Here, Plaintiff's access challenges have no transaction
relation with his challenges based on allegedly insufficient
"festiveness" of his Passover meals, or to the alleged lack of
morning rabbi-led daily prayers, or to the alleged insufficient
length of rabbi-led Sabbath prayers, or to the alleged denial of
his request to keep his tallit in his cell around-the-clock, or
to the alleged denial of Passover "treats" in 2008 or to the
alleged inability to attend the entirety of the first Passover
Seder in 2010.  Moreover, in addition to lack of transactional
relatedness, Plaintiff's access claims have no relation to the
named Defendants, since it is self-evident that neither the Imam,
nor either one of the Rabbis, nor Sister Elizabeth, nor the
original Doe (i.e., an alleged leader of an unidentified
religious volunteer group), nor the later version of Doe (i.e., a
prison clerk who mis-forwarded Plaintiff's request for clearance
to the balcony area) had anything to do with Plaintiff's access
to the law library.  Moreover, Plaintiff's allegations do not
suggest that the Warden or Mr. Holmes had anything to do with the

access-to-law-library matter.  Hence, Plaintiff's access claims
are subject to dismissal under Rules 18 and 20.

        b.   *Substantive Invalidity*

     Moreover, even if the Court were to disregard the procedural
deficiencies of Plaintiff's access claim, his allegations should
be dismissed for failure to state a claim upon which relief can
be granted.  As noted <u>supra</u>, under the test set forth in
<u>Christopher</u>, 536 U.S. 403, the inmate must assert facts showing
that he had a non-frivolous legal claim, which pursuit was so
successfully frustrated by the acts of defendants that it
resulted in the inmate's actual loss of the opportunity to obtain
a remedy with regard to these particular legal claim.

     Here, Plaintiff asserts that his access rights are violated
because, due to his insufficient access to the law library, he
has been unable to add to the voluminous submissions he already
deposited on the docket.  However, such allegations fail to meet
the <u>Christopher</u> standard, since the claims now dismissed by the
Court were not deficient because of the interference of prison
officials.  Rather, these claims failed because, despite
Plaintiff's voluminous filings, he failed to state a plausible
claim.  Indeed, the Court's prior opinion *excused* Plaintiff's
non-compliance with Rule 8 requirements and allowed repleading,
providing Plaintiff with an outline of applicable pleading
standards and instructing Plaintiff to do nothing more than

allege the facts known to him.

Moreover, in the instant decision, the Court employed presumptions that all Plaintiff's claims are timely and that the facts asserted by him are grounded in Plaintiff's sincerely held religious beliefs.  Hence, all dismissed claims in this action were deemed invalid not on the grounds that Plaintiff's voluminous submissions failed to cite law but because the *facts* Plaintiff asserted (which Plaintiff, by definition, could not find in any law library) could not amount to viable challenges. See, e.g., Hoffenberg v. Grondolsky, 2009 U.S. Dist. LEXIS 117549, at *18 (D.N.J. Dec. 17, 2009) ("Here, Plaintiff's allegations are not being dismissed on the grounds of . . . Plaintiff's inability to access [certain legal] documents, [since such inability,] even if true, has nothing to do with the Court's previous -- or instant -- dismissal of this matter.  Rather, Plaintiff's instant claims are being dismissed on the grounds of Plaintiff's own persistent refusal to submit a clear and concise complaint stating the facts [amounting to a viable allegation]. Therefore, Plaintiff failed to allege that he suffered an actual injury (within the meaning of the access-to-the-courts claim) as a result of any actions by Defendants").  Thus, Plaintiff's access claims will be dismissed, with prejudice.

## 2.   Construction as an Application to Amend

Ordinarily, the plaintiff may be granted "leave [to amend,]

. . . when justice so requires." See <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962).  Indeed, "[t]he Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits."  <u>Id.</u> at 182-83.

Here, in addition to a lengthy brief (operating, seemingly, as a legal support to Plaintiff's motion to amend, plus asserting denial of access to the law library), Plaintiff's motion also contains a proposed re-amended complaint.  See Docket Entry No. 13-2.

a.   *Additional Defendants*

The proposed "re-amended complaint" adds two more Defendants to the list of those already named in the amended complaint, specifically, two more John Does.

Referring to the first such John Doe by the pronoun "he" as well as by the pronoun "they," Plaintiff asserts that, "[o]n the night of 4/19/08 he placed a substantial burden on the exercise of my religious beliefs 'or' they subjected me to invidious discrimination 'or' they took my liberty interest without 'due' process 'or' they violated my right of free exercise."  <u>Id.</u> at 5. With regard to the second additional John Doe, Plaintiff – this time utilizing only the pronoun "they" – repeats, verbatim, the very same assertion, except for substituting the date "4/19/08"

with "5/3/10".   <u>See</u> <u>id.</u> at 7.   These allegations also state that
the first John Doe is "[an unknown] prison chaplain or volunteer
[of an unspecified organization]," while the second John Doe is
"administrator [of an unspecified entity] or designee [of an
unspecified person]." <u>Id.</u> at 4, 7.

Such allegations, containing nothing but generalities,
popular names of constitutional claims and recitals of elements
of these claims fail to state viable allegations against these
two new Does under the standard detailed in <u>Iqbal</u> and, thus, will
be dismissed without further discussion.

b.   *Additional Allegations*

The factual allegations contained in the proposed re-amended
complaint virtually repeat (and, on numerous occasions, expressly
incorporate) the allegations stated in the Amended Complaint.
The only substantive distinction the Court could gather might be
reduced to the two following lines of claims:

i.   *Elaboration of the "Festive Meal" Claims*

According to the proposed re-amended complaint, prior to
Passover of 2008, 2009 and 2010, an organization – defined by
Plaintiff as "Aleph Institute or some other outside source" –
"donated to the Jewish [inmate] congregation [at Plaintiff's
place of confinement certain unspecified] necessary food and
religious ritualistic elements." Docket Entry No. 13-2, at 10.
Allegedly, as a result of prison officials' utilization of these

unspecified "food" and "ritualistic elements," the Jewish inmates held in the general prison population were provided with the meals which Plaintiff deemed sufficiently "festive,"[38] while Plaintiff (being an inmate held in segregated confinement in 2008 and in 2009 or - in 2010 - being a transferee from segregated confinement who was attending 2010 Seders on emergent limited clearance directed by the Warden just hours, if not minutes, prior to the first Seder and just a day prior to the second Seder) was not provided with the same "festive" meal and was served, during the second Seder of 2010, with a prepacked kosher-for-Passover tray that he found insufficiently "festive."

Just as Plaintiff's allegations stated in his Amended

--------

[38]   Since Plaintiff's Amended Complaint asserted that, upon his arrival at the location of the congregational Seder of 2010 and throughout the remainder of that Seder, Plaintiff did not see either any "signs" of any "festive meal" or even any "remains" of such "festive meal," See Docket Entry No. 10, at 8, the Court is not entirely clear as to how Plaintiff's statement made in the Amended Complaint could be squared with Plaintiff's assertion – made in his proposed re-amended complaint, i.e., it is unclear how he can now claim that the general prison population's Jewish inmates were provided with "festive meals," unless these festive meals disappeared without a trace prior to his arrival.  However, while noting this anomaly of Plaintiff's position, see Jackson v. Broad. Music, Inc., 2006 U.S. Dist. LEXIS 3960, at *18 (S.D.N.Y. Jan. 31, 2006) ("the court may take judicial notice of . . . 'admissions in pleadings . . . filed by a party . . . that contradict the party's factual assertions in a subsequent [stage]'") (quoting Harris v. New York State Dep't of Health, 202 F. Supp. 2d 143, 173 (S.D.N.Y. 2002), and citing Munno v. Town of Orangetown, 391 F. Supp. 2d 263, 268 (S.D.N.Y. 2005)), the Court need not focus on this obvious incongruety since Plaintiff's proposed amended challenges based on "festive meal" fail to state a viable claim.

Complaint, Plaintiff's proposed addition presents a conflation
of: (a) his existing free exercise challenges; and (b) an
elaboration on his equal protection position.  However, just as
Plaintiff's equal protection challenges asserted in his Amended
Complaint, the allegation in the proposed re-amended complaint
fails to state a cognizable claim, since Plaintiff's status as a
prisoner held in segregated confinement (or as a prisoner having
status of a recent transferee attending on the basis of an
emergent limited clearance) cannot qualify Plaintiff as a member
of protected class.  This is so because the prison authorities
could reasonably:

(a)  apply different degree of scrutiny inspecting the content of
     items/foods dispensed to inmates in the general population
     and in segregated confinement (especially if such scrutiny
     is performed with regard to items obtained not through a
     regular, secure chain of prison supply but with regard to
     the dishes donated by a non-secure "outside source"); and

(b)  elect not to try obtaining additional charitable donations
     (or not to engage in costly last-minute Passover purchases)
     and, instead, serve a kosher-for-Passover prepacked meal to
     Plaintiff.  Cf. Williams, 343 F.3d 212 (observing that
     legitimate penological interests include staying within the
     prison's budget and conservation of prison's human
     resources).

Therefore, the equal protection aspects of Plaintiff's claims elaborated-upon by reference to the unspecified "food and ritualistic elements" allegedly donated by "Aleph Institute or some other outside source" are without merit, and Plaintiff's application to re-amend his pleadings by inclusion of such challenges will be denied, as futile.  See McKinney v. Passaic County Prosecutor's Office, 2009 U.S. Dist. LEXIS 53216, at *13 (D.N.J. June 24, 2009) ("Since Plaintiff had [prior] opportunities to plead his claims, and yet failed to assert any facts suggesting that [these] claims are plausible, it would be futile to allow Plaintiff [another] bite of this well-chewed apple"); see also Falchenberg v. N.Y. State Dep't of Educ., 338 Fed. App'x 11, 2009 U.S. App. LEXIS 12213 (2d Cir.) (plaintiff was not entitled to amend her complaint because her proposed claims were based on same allegations which court had concluded failed to state viable claim), cert. denied, 130 S. Ct. 1059 (2010).

ii.  *Claims Based on Lack of Teffilin*

In addition to elaborating on his "festive meal" challenges, Plaintiff also seeks to amend his claims with an assertion that – as a result of his placement in segregated confinement, and during the entire period of such segregation – Plaintiff was not provided with the institutionally-owned "teffilins."  See Docket Entry No. 13-2, at 9.

Page -79-

Traditionally, the term "tefillin" describes a set of two small cubic leather boxes, each of which: (a) contains scrolls of parchment inscribed with verses from the Torah; and (b) has a leather strap attached.[39]

Teffilin[40] is worn by observant Jews during morning prayers every day except on Sabbath and on Holy Days.  See Ulmann v. Anderson, 2003 U.S. Dist. LEXIS 874, at 84 (D.N.H. 2003). Plaintiff asserts that institutionally-owned teffilin sets are

_____

[39] Granted that Plaintiff's religious believes are self-forged on the basis of Plaintiff's own reading of the Old Testament and are, allegedly, constantly evolving, this Court has no means to determine what exactly is Plaintiff's current vision of teffilin or its use.  The traditional Jewish source for the teffilin requirement ensues from Exodus 13:9 and 13:16, and Deuteronomy 6:8.  Before the prayer, the "arm-teffilin" is usually placed (or "laid") on the biceps of the arm, with the strap wrapped around the arm, hand and fingers; traditionally, the strap should be long enough to allow for a knot, plus wrapping around the forearm seven times, and also to tie around the hand and fingers according to particular tradition followed. See Isaac Klein, A Guide to Jewish Religious Practice 6-9 (1979). Next, pursuant to Deuteronomy 6:5-8, the head-teffilin is traditionally placed on top of the head, aligned between the worshiper's eyes, with the strap (having two sides extending on both sides of the teffilin) tied at the back of the head and then brought in front of the shoulders; each of this two straps should, traditionally, be rather long, typically long enough the reach the worshiper's navel on the left side and his genital area on the right side.  See id.  These straps ("retzuah") are typically at least 9 millimeters wide or, preferably, 10 to 11 millimeters in width, and about 1.5 millimeter in thickness.  See << http://www.stam.net/tefillin_straps.aspx>>. Traditionally, the straps are made of leather and intended to be strong, resilient binds.  See id.

[40] Used as a collective (for both arm-teffilin and head-teffilin), the term "teffilin" implies a plural reference.  An unspecified, to arm or to head, designation is "tefilla."  See << http://www.britannica.com/EBchecked/topic/1318171/tefilla>>.

retained in safekeeping (seemingly, either at the prison Chapel or in the area designated for congregational Jewish services) and dispensed to the Jewish inmates held in the general population only for the purposes of congregational morning prayer conducted at that designated area.  See Docket Entry No. 13-2, at 9.

In his proposed re-amended complaint, Plaintiff maintains that, upon Plaintiff's placement in segregated confinement, the Imam informed Plaintiff that: (a) the number of institutionally-owned teffilin sets was sufficient to accommodate only the needs of the Jewish inmates held in the general population; but (b) the then-serving rabbi, Rabbi Lev, had been planning to place an order for additional teffilin sets and, if such purchases were made, the Imam was planning to ensure that an institutionally-owned teffilin would be dispensed to Plaintiff during his segregated confinement.  See id.

Since Plaintiff had not been allowed the use of an institutionally-owned teffilin until his reentry into the general prison population, Plaintiff seeks to re-amend his Amended Complaint by inclusion of his claims based on denial of use of such institutionally-owned teffilin during the two years Plaintiff spent in segregation.  See id.

The deficiencies of Plaintiff's proposed claim are quite substantial.  To start, Plaintiff's claims are based on pure conjecture that the prison actually purchased additional teffilin

sets and – in addition – such purchases were actually made during the time when Plaintiff was in segregated confinement.  Moreover, there appear to be numerous legitimate security concerns associated with dispensing, into a prisoner's unsupervised use, such items as teffilin, since the straps attached to both teffilin – being, effectively, sets of three long, strong leather ropes – might be used as a weapon either against correctional officers or other inmates.  Cf. Campos v. Coughlin, 854 F. Supp. 194, 214 (S.D.N.Y. 1994) (quoting a prison regulation proving that "[i]It is not acceptable [for inmates even] to wear [at any time any] religious [symbols that are] affixed to . . . leather, strings, or rope").

However, the Court is mindful of the distinct use of teffilin, that is, for the purposes of the traditional Judaism. In the event Plaintiff's self-forged beliefs are currently at the stage corresponding to the tenets of traditional Judaism, then Plaintiff's intended use of teffilin should be solely during the time of his morning prayers (presumably on all days except for Sabbath and Holy Days).  Although Plaintiff's numerous expressions of dissatisfaction with the shortness of religious services rendered to him suggest Plaintiff partakes in a lengthy morning prayer exercise, it is also possible that Plaintiff's morning prayer would not be so long as to impose a significant burden on the prison's resources.  If so, it appears that a

prison officer's supervision of Plaintiff's use of teffilin during his morning prayer might be a rather minor expenditure of the prison's human resources.

Indeed, Plaintiff's allegation that the Imam indicated to him that Plaintiff would be provided with a teffilin if additional sets are, in fact, purchased[41] suggests that the security concerns and/or human resource burdens associated with Plaintiff use of teffilin might have been rather insignificant. Therefore, the overall reading of Plaintiff's proposed additional challenges based on the alleged denial of use of institutionally-owned teffilin appears to be at the borderline between the "possibility" and "plausibility" options of Iqbal.  Thus, out of an abundance of caution, the Court will permit Plaintiff to re-amend his Amended Complaint with regard to his access-to-teffilin claim.

---

[41]  Although Plaintiff does not appear to present a contractual claim against the Imam for his alleged promise to procure additional teffilin, to the extent that his allegations may be construed to assert such a claim, the claim would be deficient for a number of reasons, including a lack of consideration.  See Parker v. Gateway Nu-Way Found., 2010 U.S. Dist. LEXIS 115116, at *16 (D.N.J. Oct. 26, 2010) (an alleged agreement between an inmate and a charitable employee permitted to operate at the prison failed for lack of consideration on the inmate's part since the promise made by the employee did not impose upon the plaintiff a duty or behavioral limitations materially different from or additional to those ensuing from normal requirements imposed on inmates by the prison life) (citing Restatement (Second) of Contracts § 73 and cmt. b(1981)).

C.   **Application for Injunctive Relief**

As noted <u>supra</u>, among Plaintiff's recent tide of filings was his motion for preliminary injunctive relief, seeking this Court's order directing Plaintiff's around-the-clock in-cell possession of his tallit, allegedly, for his prayers at any time when Plaintiff might wish to so pray.  <u>See</u> Docket entry No. 12. Defendants filed their response to said motion asserting that it is premature because: (a) Plaintiff's Amended Complaint was not screened by this Court; and (b) Defendants did not have an opportunity to answer Plaintiff's pleadings.[42]  <u>See</u> <u>id.</u> at 15.

The standard for the issuance of a preliminary injunction is well established:

> A preliminary injunction is an "extraordinary remedy," and the party seeking it must show: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief."

<u>Ball v. Beard</u>, 2010 U.S. App. LEXIS 20792, at *2 (3d Cir. Oct. 7, 2010) (quoting <u>Kos Pharms., Inc. v. Andrx Corp.</u>, 369 F.3d 700, 708 (3d Cir. 2004)).  Where the movant failed to establish one

---

[42] Defendants cited no support for their position that Plaintiff's application is facially premature, and this Court, on its own, is not aware of any provision barring a litigant from submitting a motion for injunctive relief together with the litigant's initial pleading.  Indeed, the only prematurity associated with Rule 65 this Court is aware of is a scenario where the *court* renders a premature determination on merits of the claims raised in the plaintiff's pleading.  <u>See</u>, <u>e.g.</u>, <u>Sanchez v. Esso Std. Oil Co.</u>, 572 F.3d 1 (1st Cir. 2009).

element, the court's inquiry need not continue to other elements. See id.; see also Howard v. N.J. Div. of Youth & Family Servs., 2010 U.S. App. LEXIS 22354, at *5 (3d Cir. Oct. 28, 2010) ("We cannot agree with the grant of the preliminary injunction because we cannot conclude that [plaintiff] met the first prong of the standard, namely, that he had shown 'a reasonable probability' of success in his claim").

Here, this Court already determined that Plaintiff's claims based on the limitation as to his use of the tallit (allowing the tallit to be used by Plaintiff during his morning prayers in the designated area where the Jewish inmates congregate, and having the tallit at all other times in safekeeping by the prison authorities) did not amount to a violation of Plaintiff's free exercise rights under the composite test posed by O'Lone/Turner and elaborated upon by their progeny.  Hence, Plaintiff's tallit-based claim fails on merits.  Consequently, no injunctive relief is warranted, and Plaintiff's motion seeking such relief  will be denied, with prejudice.

### D.    **Future Course of This Litigation**

####        1.    **The Three Strikes Rule**

The Prison Litigation Reform Act of 1995 ("PLRA"), enacted on April 26, 1996, prohibits a prisoner from bringing a civil action in forma pauperis pursuant to 28 U.S.C. § 1915 "if the prisoner has, on 3 or more prior occasions, while incarcerated or

detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury."  28 U.S.C. § 1915(g) (Supp. II 1996). Dismissals for frivolousness of civil actions or appeals prior to the passage of the PLRA count as "strikes" under 28 U.S.C. § 1915(g).  See Keener v. Pennsylvania Bd. of Probation & Parole, 128 F.3d 143, 144 (3d Cir. 1997).  The PLRA further provides that, if a prisoner has had at least three "strikes," the prisoner may not bring another action in forma pauperis unless he or she is in imminent danger of serious physical injury.  See 28 U.S.C. § 1915(g).

Here, Plaintiff's multiple rounds of pleadings unambiguously indicate that he is not in imminent danger of any physical injury.

### 2.  Plaintiff's Statements Made in This Matter

Plaintiff's Complaint (a document entirely hand-written by Plaintiff and having no pre-printed form pages incorporated), presented a seventy-two-paragraph diary-like narrative, opening, right after the statement of jurisdiction, with Paragraphs 2, 3 and 4 that were dedicated to listing Plaintiff's prior litigations.  See Docket Entry No. 1, at 2-4.  Specifically, Plaintiff referred to: (a) Love v. Oglesby, Civil Action No. 97-

0221 (GTE) (E.D. Ark.), stating that the Eastern District of
Arkansas granted dismissal on pleadings to the defendant, but the
Eighth Circuit reversed, and the matter was closed only when the
Eastern District of Arkansas granted defendant's motion for
summary judgment;[43] (b) <u>Love v. Andrews</u>, Civil Action No. 00-0125
(WRW) (E.D. Ark.), stating that the action was dismissed for
failure to state a claim upon which relief can be granted; and
(c) <u>Love v. Andrews</u>, Civil Action No. 01-1269 (8th Cir.), stating
that the Eighth Circuit reached the same determination.  <u>See</u>
Instant Matter, Docket Entry No. 1, at 2-4.   Plaintiff's
Complaint closed with the statement, "I declare under penalty of
perjury that the foregoing is true and correct."  <u>Id.</u> at 22.

      Moreover, Plaintiff's first round of amended complaint,
which Plaintiff later qualified as a "supplement" to his

---

[43]   In that action, Plaintiff alleged that the prescribed
medication dispensed to him caused him mental damage and was
excessive as an eye-drop prescription.  <u>See</u> <u>Love v. Oglesby</u>,
Civil Action No. 97-0221, Docket Entry No. 2 (GTE) (E.D. Ark.).
The district court <u>sua</u> <u>sponte</u> dismissed the claims against the
prescribing doctor and, on the motion of two remaining nursing
staff defendants, dismissed the remainder of Plaintiff's
challenges for failure to state a claim.  A split panel of the
court of appeals affirmed the dismissal, but reversed the portion
of <u>sua</u> <u>sponte</u> dismissal based on the allegedly excessive
prescription.  <u>See</u> <u>id.</u>, Docket Entry No. 96 (with Judge Loken
dissenting as to the reversal and remand determination on the
grounds that no claim of excessive prescription can amount to a
viable Eighth Amendment challenge since it presents, at most, a
medical malpractice state law claim).  Upon remand, the
excessive-prescription challenges were dismissed by the district
court upon the doctor's motion for summary judgment.  <u>See</u> <u>id.</u>,
Docket Entry No. 128.

Complaint, made the same averment.  See Docket Entry No. 3, at 2-
3 and 17.

Presuming veracity of Plaintiff's statements, this Court
granted Plaintiff in forma pauperis status to prosecute the
instant matter.  See Docket Entry No. 7.

Plaintiff's latest round of submissions, including his
Amended Complaint (submitted in response to this Court's prior
order dismissing the Complaint and "supplement" without
prejudice) asserted, again, the very same list of Plaintiff's
prior litigations and, again, made the very same averment, see
Docket Entry No. 10, at 3-4 and 11, assuring the Court that
Plaintiff's prosecution of this action in forma pauperis was
proper.

### 3.    Plaintiff's Prior Litigations

Plaintiff's averred submissions made in this matter were not
reflective of the truth, be it with regard to the entire massive
body of Plaintiff's prior litigations or with regard to those
actions where Plaintiff's challenges were either dismissed for
failure to state a claim or where frivolous appeals were taken.

### a.    Failure-to-State-a-Claim Actions

While Plaintiff correctly stated that his action in Love v.
Andrews, Civil Action No. 00-0125 (WRW) (E.D. Ark.), was
dismissed for failure to state a claim, and his appeal in Love v.
Andrews, Civil Action No. 01-1269 (8th Cir.) was dismissed for

failure to allege a constitutional violation, Plaintiff omitted

from his statement any mention of all his other legal actions,

including his litigation in Love v. Dawson, 03-0169 (SWW) (E.D.

Ark.), even though that particular litigation was the third

action within the meaning of the three-strikes rule.[44]

There appears to be no doubt that Plaintiff was aware of the

disposition reached in his Dawson action, since: (a) the action

lasted half a year; (b) during the course of that litigation,

Plaintiff submitted two motions,[45] an original complaint, an

---

[44] Plaintiff's district-level and appellate-level actions in
Love v. Andrews count as two strikes within the meaning of the
three-strikes rule, since: (a) there is no bar to counting the
dismissal of a case in the district court level as one strike and
the dismissal of appeal as at the circuit level as a second
strike, see Adepegba, 103 F.3d at 388; Hains v. Washington, 131
F.3d 1248, 1250 (7th Cir. 1997)("[A] complaint that is dismissed
under § 1915A for failure to state a claim[] followed by a
frivolous appeal leads to two 'strikes' under 28 U.S.C. §
1915(g)"); and (b) the Eastern District of Arkansas expressly
stated that "[h]aving reviewed Plaintiff's complaint, the
[district court] finds that it must be dismissed for failure to
state a claim [and it also] certifies that any appeal taken from
an Order and Judgment dismissing this action [would be]
frivolous," Love v. Andrews, Civil Action No. 00-0125, Docket
Entry No. 4, at 1-2 (WRW) (E.D. Ark.), see also id. Docket
Entries Nos. 6 and 7 (E.D. Ark.) ("any appeal taken from this
order and the judgment entered under it would be frivolous"), and
the Court of Appeals for the Eighth Circuit expressly stated that
"we agree that [Plaintiff] failed to allege a constitutional
violation." Love v. Andrews, Civil Action No. 01-1269, Docket
Entry docketed on 05/22/2001, at 2 (8th Cir.).

[45] One of Plaintiff's motions in Love v. Dawson, 03-0169
(SWW), was his application to proceed in forma pauperis in that
action.  Chief Judge Wright denied his application observing that
Plaintiff had the prison account balance of $1,008.89, the most
recent deposit to his account was $2,193.20, with the average
monthly balance of $363.53, hence indicating that Plaintiff had

amended complaint, a second amended complaint, an "addendum" to
that second amended complaint, the third amended complaint, as
well as Plaintiff's opposition to defendants' motion to dismiss
Plaintiff's pleadings (seeking such dismissal on the grounds of
his failure to state a cognizable claim).  See id., Docket
Entries Nos. 1-8, 10, 11 and 19.

     As detailed in Jennings v. Natrona County Detention Center
Medical Facility, 175 F.3d 775, 780 (10th Cir. 1999), and
Adepegba v. Hammons, 103 F.3d 383 (5th Cir. 1996), an action that
is dismissed for failure to state a claim does not count as a
strike if an appeal of that dismissal is pending.  However,
Jennings and Adepegba clearly hold that a "dismissal should not
count against a litigant until he has exhausted or waived his
appeals."  Jennings, 175 F.3d at 780; see also Adepegba, 103 F.3d
at 387 ("A dismissal should not count against a petitioner until
he has exhausted or waived his appeals").

     In a civil case, a party wishing to appeal an order or
judgment must file a notice of appeal within thirty days after
the judgment or order appealed from is entered.  See Fed. R. App.
P. 3(a)(1) and 4(a)(1)(A); Brown v. Beard, 371 Fed. App'x 257,
258-60 (3d Cir. 2010) (applying Rule 4(a)(1)(A) to a claim under
42 U.S.C. § 1983 brought by a pro se prisoner).  "[T]he taking of

---

sufficient means to pay the applicable filing fee.  See id.
Docket Entry No. 9.

an appeal within the prescribed time is mandatory and jurisdictional." Bowles v. Russell, 551 U.S. 205, 209 (2007) (internal citation and quotation marks omitted).  Failure to file a timely notice of appeal deprives the appellate court of jurisdiction.  See id. at 209-10.  Where, as here, a party fails to file a timely notice of appeal of an order, the party effectively waives his right to appeal that order.  "Even if district court dismissals do not count as strikes while appeal is available, once the time of appeal has expired, that is the end of the matter, and untimely attempts to appeal do not change the situation." Smith v. District of Columbia, 182 F.3d 25, 28 (D.C. Cir. 1999).  Since Plaintiff's time to appeal Chief Judge Wright's decision in Love v. Dawson, 03-0169 (SWW) (E.D. Ark.), had long expired, that decision counts as the third "strike" under the three-strikes rule, barring Plaintiff from proceeding in forma pauperis in this matter.

> b.   Other Actions

     In addition to the three above-discussed actions, Plaintiff initiated at least nine other district-level litigations (that is, not counting the instant matter), and at least five appellate proceedings.  Two of the aforesaid ten district-level proceedings ensued from his filing of an original and successive Section 2254 petitions, see Love v. Norris, Civil Action No. 94-0078 (SMR) (E.D. Ark.) (denying the petition), Love v. Norris, Civil Action

No. 97-0428 (JFF) (E.D. Ark.) (staying successive petition subject to the Eighth Circuit's determination); and one of his appellate matters was his application for leave to file such a successive § 2254 petition, which was denied.  See Love v. Norris, Civil Action No. 98-8019 (8th Cir.).

The remainder of Plaintiff's litigations consisted of civil rights actions asserting, virtually without any variance, either denial of medical care to Plaintiff and/or violation of his free exercise rights and/or violation of his access-to-the-courts rights and/or violation of his equal protection rights.  See Love v. Wade, Civil Action No. 97-0207 (GH) (E.D. Ark.); Love v. Reed, Civil Action No. 97-0208 (NHJ) (E.D. Ark.); Love v. Oglesby, Civil Action No. 97-0221 (GTE) (E.D. Ark.); Love v. McCown, Civil Action No. 00-0091 (JMM) (E.D. Ark.); Love v. Wade, Civil Action No. 01-0338 (JTR) (E.D. Ark.); Love v. Hobbs, Civil Action No. 02-0054 (JMM) (E.D. Ark.); Love v. Huckabee, Civil Action No. 02-0251 (JMM) (E.D. Ark.); Love v. Moka, Civil Action No. 02-0432 (GH) (E.D. Ark.); see also Love v. Reed, Civil Action No. 99-4139 (8th Cir.); Love v. Oglesby, Civil Action No. 00-3212 (8th Cir.); Love v. Evans, Civil Action No. 02-1155 (8th Cir.); and In re Love, Civil Action No. 02-3769 (8th Cir.) (seeking mandamus relief).  Although it appears that Plaintiff prevailed in two of these district-level actions on bench trials (getting the peanut-butter-and-bread accommodation in one and the transfer to his

current New Jersey facility in another) and settled one of the
district actions asserting insufficient medical care, Plaintiff's
litigation practices in all above-listed actions cause this Court
substantial concern, since all these proceedings were heavily
peppered with: (a) Plaintiff's systemic filings of three, four
and even five rounds of amended complaints, submitted often half-
way into litigation and even at the eve of trial; (b) his
invariably reoccurring motions for preliminary injunctive relief
and temporary restraining orders, repeatedly filed regardless of
constant denials; (c)  Plaintiff's consents to have his actions
adjudicated by magistrate judges, followed by his nearly
immediate withdrawals of those consents; (d) his massive flocks
of "declarations" and strings of "briefs," frequently
"supplemented" and "re-supplemented" by additional rounds of
"briefs"; (e) Plaintiff's prematurely filed motions for summary
judgments, oddly followed by his motions to compel discovery; (f)
his applications for "disqualifications" and "statements of
necessity"; (g) his objections to recommendations of magistrate
judges; (h) his premature and yet repeatedly filed demands for
setting trial dates; (i) Plaintiff's habitual requests for non-
prejudicial withdrawals of his actions, after months or even
years of litigation, right after defendants' filings revealing
core deficiencies of his position; (j) his requests for
reinstatements of his actions after his applications for

withdrawals were granted, etc.  Moreover, the bulk of these submissions, marked by a concerning paucity of substance, presented overly-lengthy regurgitations of the very same boilerplate language that was provided to Plaintiff in the decision entered by the district/magistrate judges in his prior cases (or docketed with regard to his prior submissions).

Being presented with the same litigation practices right at the outset of this matter, the Court notes its understanding for the rationale of Plaintiff's mechanical paraphrasing of elements of action in lieu of factual allegations: such pleading mode was permissible during the now-archived reign of Conley v. Gibson. However, the Court fails to see a good faith-basis for Plaintiff's post-pleading litigation strategies that produced hundreds of overly-voluminous docket entries, clogged the dockets, unduly usurped court resources and tied the efforts of defendants.  Plaintiff, therefore, is expressly cautioned that this Court, while standing ready to ensure Plaintiff's due opportunity to litigate his *meritorious* claims, will not tolerate any abusive or recreational litigation practices.[46]

---

[46]  A "recreational litigant" is the "one who engages in litigation as sport and files numerous [submissions] with little regard for substantive law or court rules."  Jones v. Warden of the Stateville Correctional Ctr., 918 F. Supp. 1142, 1153 (N.D. Ill. 1995) (noting that, "[w]hen confronted with [a] recreational plaintiff, courts, to protect themselves and other litigants, have enjoined the filing . . . without leave of court" and citing In re Winslow, 17 F.3d 314 (10th Cir. 1994); In re Burnley, 988 F.2d 1 (4th Cir. 1992); and Mayfield v. Collins, 918 F.2d 560

### 4.   Plaintiff's Pauper Status Will Be Revoked

Where the inmate's "'Prisoner Complaint' forms misrepresented how many strike suits he had filed prior to bringing the instant action, [the inmate] should not benefit from his own misleading submissions." Harris v. City of New York, 607 F.3d 18, 23 (2d Cir. 2010).  Thus, the inmate's in forma pauperis may be revoked at any time if the court, either sua sponte or on a motion, determines  that the status was improperly obtained. See, e.g., Lewis v. Burger King, 2010 U.S. App. LEXIS 19546 (10th Cir. Sept. 1, 2010) (a court can revoke a grant of in forma pauperis if it later appears that the litigant had sufficient funds at the time (s)he filed the complaint); see also Harris, 607 F.3d at 23 ("the three strikes rule is not an affirmative defense that must be raised in the pleadings [–] district courts may apply the three strikes rule sua sponte") (citing Thompson v. Drug Enforcement Admin., 492 F.3d 428, 435-36 (D.C. Cir. 2007), and Andrews v. King, 398 F.3d 1113, 1120 (9th Cir. 2005)); accord Treff v. Galetka, 74 F.3d 191, 197 (10th Cir. 1996) ("Leave to proceed [in forma pauperis] is a privilege, not a right[,] courts have the discretion to revoke that privilege when it no longer serves its goals") (citation omitted).

Moreover,

[n]othing in the PLRA or the caselaw . . . suggests

-----

(5th Cir. 1990)).

that courts have an affirmative obligation to examine
actual orders of dismissal.  See Thompson, 492 F.3d at
434-35 (accepting docket reports indicating that prior
dismissals satisfied at least one of the § 1915(g)
criteria for a strike); Andrews, 398 F.3d at 1120
("[D]istrict court docket records may be sufficient to
show that a prior dismissal . . . counts as a strike");
cf. Leonard v. Lacy, 88 F.3d 181, 185 (2d Cir. 1996)
("A docket is a court's official record of what occurs
in a case").  The district court may rely on the
relevant docket sheets if they indicate with sufficient
clarity that the prior suits were dismissed on the
grounds that they were frivolous, malicious, or failed
to state a claim upon which relief may be granted.  See
Andrews, 398 F.3d at 1120.

Harris, 607 F.3d at 23.

This Court, therefore, will revoke Plaintiff's in forma
pauperis status on the basis of the information obtained as a
result of the Court's own research.  However, out of abundance of
caution, the Court will allow Plaintiff an opportunity to show
cause as to why his in forma pauperis status should be
reinstated.[47]  In alternative, Plaintiff will be allowed an
opportunity to prepay the applicable filing fee of $350, in its

---

[47]  In the event Plaintiff elects to file his response to the
Court's order to show cause, Plaintiff's response *must* be limited
to a submission: (a) not exceeding ten pages, single sided; (b)
with each page having margin no less than one inch on each side;
(c) having no more than 24 lines per page (i.e., double-spaced);
and (d) utilizing common font, such as Arial, Courier New or
Times New Roman, or hand-printed in a comparable (i.e., not
narrow) font style; (d) stating Plaintiff's position clearly and
concisely, with concise references to exhibits/documents but
without any attachment of copies of the same; and (e) with clear
citation to legal sources, if Plaintiff desires to cite law, *but
without any regurgitation of any boilerplate language*.

entirety;[48] he will be provided with an extended period to make such prepayment.

### III. CONCLUSION

For the foregoing reasons, Plaintiff's motion seeking injunctive relief will be denied.  Plaintiff's motion to amend will be denied in part and granted in part.  Plaintiff's claims stated in the Amended Complaint and his proposed re-amended complaint will be dismissed, with prejudice, with exception of three narrowly-tailored lines of claims, as detailed supra.  All Plaintiff's claims dismissed by this Court sua sponte will remain conclusively dismissed regardless of the future course of this litigation.  Plaintiff's in forma pauperis status will be revoked.  This matter will be administratively terminated subject to reopening in the event Plaintiff either timely shows cause for reinstatement of his in forma pauperis status or timely prepays the filing fee.  Plaintiff will be directed not to make any other forms of submissions.

An appropriate Order accompanies this Opinion.


                                    /s/ Garrett E. Brown, Jr.
                                 **GARRETT E. BROWN, JR.**
                                        **Chief Judge**
                                **United States District Court**

Dated: January 31, 2011

---

[48] The installment filing fee collections made thus far will be remitted to Plaintiff.